**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS,** ) ) ) ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | No. 1:24-cv-02361 |
| ) | |
| **LEE ZELDIN, in his official capacity as Administrator,** ) **U.S. Environmental Protection Agency,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **U.S. ENVIRONMENTAL PROTECTION AGENCY,** ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS'
AND DEFENDANT-INTERVENOR'S CROSS-MOTIONS TO DISMISS, OR IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.     This Court Has Jurisdiction over Plaintiff's Claims. .........................................................2

     A.    Plaintiff Has Standing on Behalf of Its Members to Challenge EPA's Failure to Discharge Its Nondiscretionary Duties. ....................................2

     B.    Plaintiff's Claims Are Properly Before This Court .............................................7

     C.    EPA (Still) Has a Nondiscretionary Duty to Waive Cellulosic Biofuel Volumes and Issue Waiver Credits for 2023. ...........................................9

          1.    The Statute Has a Date-Certain Deadline That Reinforces, Rather Than Refutes, EPA's Duty to Act. ..............................................10

          2.    EPA's Duty to Implement the Cellulosic Biofuel Waiver Does Not Terminate When EPA Violates Other Statutory Deadlines...........................................................................................12

          3.    EPA's Proposed "Single Best Meaning" of the RFS Departs from the Agency's Prior Interpretations of the Statute with No Explanation. .........................................................................15

               a.    EPA Has Consistently Maintained That the Cellulosic Biofuel Waiver Remains Available. ...........................15

               b.    EPA Waived 2024 Cellulosic Biofuel Applicable Volumes Under Circumstances Similar to 2023. .......................16

     D.    Policy Considerations Fail to Overcome Statutory Text.....................................18

II.    The Court Should Compel EPA to Exercise the Cellulosic Waiver and Make Available Cellulosic Biofuel Credits by March 31, 2026. ....................................21

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Petroleum Inst. v. EPA*,
706 F.3d 474 (D.C. Cir. 2013) .................................................................................14

*Am. Petroleum Inst. v. Johnson*,
541 F. Supp. 2d 165 (D.D.C. 2008) ...........................................................................6

*Ams. for Clean Energy v. EPA*,
864 F.3d 691 (D.C. Cir. 2017) ...........................................................................13, 19

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003) ..................................................................................................13

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................................................................................................9

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ........................................................................................5

*City of Dover v. EPA*,
956 F. Supp. 2d 272 (D.D.C. 2013) ............................................................................2

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) ....................................................................................2

*Ctr. for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025) ...................................................................................3

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. ---, 145 S. Ct. 2121 (2025) ..........................................................................2

*Env't Def. v. Leavitt*,
329 F. Supp. 2d 55 (D.D.C. 2004) ......................................................................21, 24

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..................................................................................................10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................................................3

*Monroe Energy, LLC v. EPA*,
750 F.3d 909 (D.C. Cir. 2014) ..................................................................................13

*N.Y. Pub. Int. Rsch. Grp., Inc v. Whitman*,
    214 F. Supp. 2d 1 (D.D.C. 2002) ....................................................................24

*Nat. Res. Defs. Council, Inc. v. EPA*,
    22 F.3d 1125 (D.C. Cir. 1994) ......................................................................23

*Nat. Res. Defs. Council, Inc. v. EPA*,
    797 F. Supp. 194 (E.D.N.Y. 1992) ...............................................................23

*Nat. Res. Defs. Council, Inc. v. Train*,
    510 F.2d 692 (D.C. Cir. 1975) ......................................................................24

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
    630 F.3d 145 (D.C. Cir. 2010) ......................................................................13

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
    753 F. Supp. 2d 103 (D.D.C. 2010) ..............................................................15

*Regions Hosp. v. Shalala*,
    522 U.S. 448 (1998) ......................................................................................13

*Royster-Clark Agribusiness, Inc. v. Johnson*,
    391 F. Supp. 2d 21 (D.D.C. 2005) ..................................................................8

*Sierra Club v. Browner*,
    130 F. Supp. 2d 78 (D.D.C. 2001) ..........................................................22, 24

*Sierra Club v. Johnson*,
    444 F. Supp. 2d 46 (D.D.C. 2006) ......................................................21, 22, 23

*Sierra Club v. McCarthy*,
    61 F. Supp. 3d 35 (D.D.C. 2014) ....................................................................7

*Sierra Club v. Wheeler*,
    956 F.3d 612 (D.C. Cir. 2020) ...................................................................7, 12

*Sinclair Wyo. Refin. Co. v. EPA*,
    101 F.4th 871 (D.C. Cir. 2024) ....................................................................21

*SSM Litig. Grp. v. EPA*,
    No. 23-1267, 2025 WL 2552531 (D.C. Cir. Sept. 5, 2025) ............................7

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ................................................................................11, 19

*Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001) ......................................................................................14

*Wis. Cent. Ltd. v. United States*,
   585 U.S. 274 (2018) ............................................................................................10

**Statutes**

42 U.S.C. § 7545(*o*)(1)(E) ....................................................................................19

42 U.S.C. § 7545(*o*)(1)(L) ....................................................................................20

42 U.S.C. § 7545(*o*)(2)(A) ....................................................................................20

42 U.S.C. § 7545(*o*)(2)(A)(i) ................................................................................20

42 U.S.C. § 7545(*o*)(2)(B)(ii) ........................................................1, 4, 7, 8, 12, 13, 14, 22

42 U.S.C. § 7545(*o*)(2)(B)(ii) ..............................................................................13

42 U.S.C. § 7545(*o*)(2)(B)(ii)(I)-(VI) ...................................................................13

42 U.S.C. § 7545(*o*)(2)(B)(3) ........................................................................10, 14

42 U.S.C. § 7545(o)(2)(B)(iv) ..................................................................8, 11, 13, 14

42 U.S.C. § 7545(*o*)(2)(D)(iv) ..............................................................................17

42 U.S.C. § 7545(*o*)(5)(D) .....................................................................................6

42 U.S.C. § 7545(*o*)(7)(A) ..............................................................................19, 20

42 U.S.C. § 7545(o)(7)(D) ......................................................1, 7, 10, 14, 19, 20

42 U.S.C. § 7545(*o*)(7)(D)(i) ......................................................4, 12, 13, 16, 22

42 U.S.C. § 7545(*o*)(7)(D)(i)-(ii) .........................................................................21

42 U.S.C. § 7604 ...................................................................................................24

42 U.S.C. § 7604(a) .................................................................................................7

42 U.S.C. § 7604(d) ..............................................................................................25

42 U.S.C. § 7607(b)(1) ............................................................................................8

**Regulations**

40 C.F.R. § 80.1407 ................................................................................................5

40 C.F.R. § 80.1426(f) ..........................................................................................20

40 C.F.R. § 80.1451(f)(1)(i)(A) ............................................................................25

40 C.F.R. § 80.1451(f)(1)(A) ...................................................................................5

40 C.F.R. § 80.1451 Tbl. 1 ....................................................................................21

**Other Authorities**

58 Fed. Reg. 51735 (Oct. 4, 1993)..........................................................................23

79 Fed. Reg. 25025 (May 2, 2014) .........................................................................25

80 Fed. Reg. 77420 (Dec. 14, 2015) .......................................................................22

87 Fed. Reg. 39600 (July 1, 2022)..........................................................................22

87 Fed. Reg. 80582 (Dec. 30, 2022) ............................................................8, 16, 22

88 Fed. Reg. 44468 (July 12, 2023).................................5, 6, 8, 9, 11, 13, 16, 18

89 Fed. Reg. 100442 (Dec. 12, 2024) ................................................................6, 23

90 Fed. Reg. 29751 (July 7, 2025)....................................1, 3, 16, 17, 18, 21, 23, 24

## INTRODUCTION

The Clean Air Act ("Act") requires EPA to set the applicable volume for introducing cellulosic biofuel into the nation's fuel supply at least 14 months before the year for which such fuel is to be introduced. 42 U.S.C. § 7545(*o*)(2)(B)(ii). No later than November 30 of the year before the year for which the applicable volumes take effect, EPA is to reduce the applicable volume if projected production does not meet that amount. *Id.* § 7545(*o*)(7)(D). Congress developed this explicit, two-step structure for cellulosic biofuel alone, to protect obligated parties from requirements that exceed cellulosic biofuel production. Because EPA never discharged its statutory, nondiscretionary duty to provide this protection for 2023, Plaintiff brought this action.

Less than three months ago, the U.S. Environmental Protection Agency ("EPA" or the "Agency") acknowledged that when "the projected volume of cellulosic biofuel production is less than the minimum applicable volume … use of the cellulosic waiver authority is mandatory[.]" 90 Fed. Reg. 29751, 29755 (July 7, 2025). EPA does not dispute that for 2023, production of cellulosic biofuel was less than the minimum applicable volume for that year, yet EPA did not issue the waiver. Defs. Resp. to Pl. SMF (ECF 18-2) ¶¶ 3, 17; Defs. Mem. (ECF 18-1) 14. There is no genuine dispute of any material fact and Plaintiff is entitled to judgment as a matter of law.

EPA tries to avoid that fate by claiming that the duty to waive cellulosic volumes *for 2023* "collapsed" into EPA's duty to set applicable volumes for that year because the Agency missed *two separate statutory deadlines*, to set and waive cellulosic biofuel standards. EPA also claims that Plaintiff should have challenged EPA's failure to exercise the waiver in petitioning for review of the 2023 cellulosic biofuel standard, notwithstanding that EPA stated—and Plaintiff agrees—the Agency cannot simultaneously set and waive the standards. Defendant-Intervenor (but notably not EPA) claims Plaintiff lacks standing and lobs a host of policy arguments at a straightforward issue of statutory interpretation. None of these arguments passes muster. EPA cannot skirt a

nondiscretionary duty by running out the clock on a predicate nondiscretionary duty (to set RFS volumes by a date-certain) and then claim that the second duty evaporated or was ripe for adjudication at a time that all agreed (and still agree) it was not. And Plaintiff has established that EPA's failure to waive cellulosic biofuel volumes and issue credits to facilitate compliance harms its members, and that exercising the waiver and issuing credits would redress that harm. In brief, nothing impedes this Court's ruling in Plaintiff's favor. The Court should grant Plaintiff's motion for summary judgment and deny Defendants' and Defendant-Intervenor's motions.

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS.

### A.    Plaintiff Has Standing on Behalf of Its Members to Challenge EPA's Failure to Discharge Its Nondiscretionary Duties.

Intervenor Coalition for Renewable Natural Gas ("Intervenor") attempts to create doubt as to Plaintiff's standing where none exists. Indeed, that EPA has not challenged Plaintiff's standing to bring this suit speaks volumes. *See Diamond Alt. Energy, LLC v. EPA,* 606 U.S. ---, 145 S. Ct. 2121, 2132 (2025) (noting "EPA's silence on standing was telling … because EPA routinely challenges a party's standing when the agency believes that [standing] is questionable"); *see also* Defs. Mem. 14 (discussing available remedy). Intervenor also overlooks that "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003); *see also City of Dover v. EPA*, 956 F. Supp. 2d 272, 277 (D.D.C. 2013) ("Assuming—as the Court must for purposes of standing—that plaintiffs are correct on the merits, and that EPA had a nondiscretionary duty … EPA's failure to undertake the process caused the [plaintiffs'] injury."). Here, assuming (as the Court must) that Plaintiff is correct that EPA has a nondiscretionary duty to exercise the cellulosic

biofuel waiver and issue cellulosic waiver credits that it did not discharge, Plaintiff's standing is plain—its members were denied compliance flexibility Congress provided in the statute.

Plaintiff's standing to sue on behalf of its members *is* self-evident: Plaintiff AFPM represents a large majority of U.S. refiners, who are obligated parties. Grissom Decl. (ECF 16-3) ¶¶ 3, 10. Plaintiff no doubt has standing to challenge annual RFS rulemakings, which regulate obligated parties, on behalf of its members. *See generally Ctr. for Biological Diversity v. EPA*, 141 F.4th 153 (D.C. Cir. 2025) (adjudicating 2023-2025 RFS rule without questioning obligated parties' standing). And were EPA to have exercised the cellulosic waiver to reduce the standard and issue credits, that too would have affected all obligated parties. *See, e.g.*, 90 Fed. Reg. at 29755. Thus, it necessarily follows that the *failure* of EPA to exercise the waiver—that is, the failure of EPA to discharge a duty meant to provide relief to all obligated parties—likewise injures all obligated parties in some way. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992) (being the object of "forgone" action leaves "little question that the . . . inaction has caused … injury"). Intervenor fails to counter the clear economic harm that Plaintiff's members have suffered as a direct result of EPA's failure to waive cellulosic biofuel volumes and issue cellulosic waiver credits, including having to buy more cellulosic biofuel RINs than they would have had EPA discharged its duty to exercise the cellulosic waiver, and to carry forward RIN deficits into the 2024 compliance year without the option of purchasing cellulosic waiver credits to facilitate compliance. And Plaintiff *did* explain that the failure to issue cellulosic waiver credits harms its members, Grissom Decl. ¶¶ 15, 20, 26, 27.c, 29, *contra* Intv. Mem. (ECF 23-1) 15—though again, that failure is an obvious and sufficient injury.

According to Intervenor, the "main problem" as to Plaintiff's standing is that the alleged harms are traceable to EPA's decision not to exercise the cellulosic waiver authority when the

Agency set the 2023 RFS volume standards, not EPA's failure to do so "after the fact." Intv. Mem. 13. This conflates Intervenor's jurisdictional argument (the existence of a duty—Plaintiff's argument on the merits) with standing, and reveals the compounded harm inflicted by EPA's tardy actions. As with so many disputes surrounding the RFS, EPA's utter inability to comply with statutory deadlines complicates what should be simple. In the RFS, Congress devised a special system for cellulosic biofuel requirements—first, EPA must promulgate the standard by a date-certain; second, EPA must assess and, if necessary, correct that standard—also by a date-certain, *before* the compliance year begins. *See* 42 U.S.C. § 7545(*o*)(2)(B)(ii), (*o*)(7)(D)(i). Had EPA promulgated the 2023 cellulosic RFS on time (by October 31, 2021), the Agency could have timely implemented the cellulosic biofuel waiver, if necessary, and issued credits (by November 30, 2022), and Plaintiff's members would not have been subject to a standard for 2023 that exceeded the projected volume available at the time. But EPA didn't promulgate the cellulosic standard on time, or exercise the waiver *at all*, so Plaintiff needed to seek relief after the compliance year. Plaintiff could not have asked EPA to waive the 2023 cellulosic biofuel requirements simultaneously with setting them—the statute flatly prohibits it—so Plaintiff could not have sought review of the 2023 RFS on that basis. *See infra* at 8. Plaintiff is not seeking a second bite at the apple—Plaintiff's members were injured twice. *See* 42 U.S.C. §§ 7545(*o*)(2)(B)(ii), (*o*)(7)(D)(i). Because the statute does not provide a specific volume for 2023 and later years, an RFS standard must be set before it can later be waived. Thus, obligated parties may challenge *both* the initial standard *and* any subsequent failure to waive that standard, if warranted.

Similarly, Intervenor's arguments that any "costs would have been incurred in 2023" and thus "would have been incurred even if the waiver were granted retroactively," Intv. Mem. 13, reflect a misunderstanding of how RFS compliance works in practice. An obligated party's RFS

compliance obligation for any given year is not determined until after the year is over and total annual production/importation of gasoline and diesel is known. For 2023, compliance was not required until March 31, 2024, allowing more than sufficient time for EPA to waive cellulosic biofuel standards and reduce compliance costs to obligated parties before they were incurred. *See* 40 C.F.R. §§ 80.1407, 80.1451(f)(1)(A); *see also* 88 Fed. Reg. 44468, 44479, n. 63 (July 12, 2023). Plaintiff's declarant explained that EPA's failure to exercise the waiver to lower cellulosic biofuel requirements meant that "[f]or the 2023 RFS compliance year, AFPM members were subjected to inflated cellulosic biofuel requirements and therefore needed to acquire more RINs (or carry forward deficits) than the Clean Air Act required, resulting in increased costs in either 2023 *or 2024*." Grissom Decl. ¶ 29 (emphasis added). And Plaintiff petitioned EPA for a waiver *before* the 2023 RFS compliance deadline, submitting its initial petition in December 2023 and then updating that request in March 2024. *See* December 2023 Petition; March 2024 Update. Had EPA granted Plaintiff's petition or acted on its own volition to waive cellulosic biofuel volumes and made credits available, Plaintiff's members would have avoided at least some of the costs from complying with a higher RFS standard, *see* Grissom Decl. ¶ 27, and that is enough. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.) ("A dollar of economic harm is still an injury-in-fact for standing purposes."). And the availability of a remedy to ameliorate those costs is still available today, which EPA acknowledges. Defs. Mem. 14.

Intervenor also asserts that obligated parties' deficits in 2023 (*i.e.*, carrying a RIN deficit into the following compliance year) cannot be traced to EPA's failure to waive cellulosic biofuels after the compliance year because (1) "there were more than sufficient RINs available to meet the applicable volume" and (2) obligated parties may claim a deficit for reasons unrelated to EPA's failure to waive. Intv. Mem. 14-15. Again, Intervenor misses the point. First, the triggering event

for exercising the waiver is projected *production*, and EPA has not disputed that, as of March 15, 2024, about 775 cellulosic biofuel RINs had been generated in 2023. Defs. Resp. to Pl. SMF ¶ 16. This is 65 million RINs less than the 840 million ethanol-equivalent gallons on which 2023 cellulosic biofuel requirements for that year were calculated. 88 Fed. Reg. at 44470, Table I.A. 1-1. Second, it does not matter whether some obligated parties may have had sufficient RINs to comply anyway, because *all* obligated parties were entitled to the lowered volume requirements and cellulosic waiver credits that EPA did not provide. Third, while obligated parties *may* carry over deficits from one year to the next, 42 U.S.C. § 7545(*o*)(5)(D), that ability is capped at 20% of their annual obligation and any deficit must be made up the next year. Grissom Decl. ¶ 13. EPA's failure to waive cellulosic biofuel volumes in 2023 will *require* some obligated parties to carry forward deficits and comply with a heightened compliance obligation in 2024. *See* 89 Fed. Reg. 100442, 100446 (Dec. 12, 2024) (noting over 20 obligated parties carried forward a deficit into 2024). Ultimately, the decisions or circumstances that led any individual obligated party to carry forward a deficit do not preclude that obligated party from *also* being injured by EPA's inaction.

Intervenor's arguments also ignore the fact that EPA's failure to waive cellulosic biofuel volumes and make credits available changed market conditions and caused Plaintiff's members to suffer economic harm by having to comply with a higher standard in 2023. The Supreme Court has "routinely" recognized that "probable economic injury resulting from agency actions that alter competitive conditions" satisfies the injury-in-fact requirement of standing. *Am. Petroleum Inst. v. Johnson,* 541 F. Supp. 2d 165, 177 (D.D.C. 2008) (quoting 3 Richard Pierce, Administrative Law Treatise § 16.4 at 1122 (4th ed. 2002)).

Finally, Plaintiff's reliance on an AFPM declarant and not a member declarant is of no moment. "[T]he requirement that an association identify specific members is most salient when an

association represents third parties who are not directly regulated." *SSM Litig. Grp. v. EPA,* No. 23-1267, 2025 WL 2552531, at *3 (D.C. Cir. Sept. 5, 2025). Where, as here, an association establishes that it has directly-regulated "members … that have been exposed to liability by EPA's" action, it need not identify those members to clear the standing bar. *Id.* at *2. In sum, Plaintiff has standing on behalf of its members to enforce EPA's failure to act.

      **B.**      **Plaintiff's Claims Are Properly Before *This* Court.**

      EPA and Intervenor argue that even if EPA had a nondiscretionary duty to waive cellulosic biofuel volumes and issue credits, Plaintiff was required to have challenged EPA's failure to act before the D.C. Circuit because the statutory deadline to waive passed before EPA promulgated the 2023 cellulosic biofuel standard, and because Plaintiff's challenge amounts to a challenge of the underlying volumes. Defs. Mem. 12-13; Intv. Mem. 16-18. Not so.

      First, and dispositively, the Clean Air Act in no uncertain terms requires that all claims regarding a failure to discharge a nondiscretionary duty be brought in federal district court, not a court of appeals. 42 U.S.C. § 7604(a). The existence or nonexistence of such duty is thus to be adjudicated here. *See Sierra Club v. Wheeler*, 956 F.3d 612 (D.C. Cir. 2020) (reviewing district court adjudication of Clean Air Act nondiscretionary duty claim); *see also Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39 (D.D.C. 2014) ("EPA's failure to take nondiscretionary action is a matter within the purview of a district court," but "the *substance* of agency action *already undertaken* is reviewable only by an appropriate court of appeals" (emphasis added)). EPA's obligation to set the cellulosic biofuel volume and its obligation to waive volumes and issue credits are distinct duties under the statute, each subject to independent scrutiny. 42 U.S.C. § 7545(*o*)(2)(B)(ii), 7545(*o*)(7)(D). When EPA has failed to promulgate annual RFS standards on time, suits to compel EPA to act are brought *here*. *E.g.*, Compl. (ECF 1) *Clean Fuels All. Am. v. Zeldin,* No. 1:24-cv-03572 (D.D.C. Feb 24, 2025); Compl. (ECF 1) *Growth Energy v. EPA,* No.

1:22-cv-01191 (D.D.C. July 26, 2022). So too, then, with a failure to waive RFS volumes.

Second, EPA's and Intervenor's arguments fail because the statute precludes EPA from waiving cellulosic biofuel volumes when it sets the standard. In the 2023-2025 RFS rule, EPA explained that it could not "use both the set authority and the cellulosic waiver authority to establish volumes at the same time[.]" 87 Fed. Reg. 80582, 80590 (Dec. 30, 2022). That is correct. Unlike in years prior to 2023, there are no statutory volumes that apply in 2023 and later years, so there is nothing to "waive" when setting standards. *See* 42 U.S.C. § 7545(*o*)(2)(B)(ii) (requiring Administrator to set volumes for 2023 and later years). The statute requires EPA to review the implementation of the program and assess multiple criteria to "set" standards. *Id.* Only *after* standards exist is it possible to waive them. Moreover, the cellulosic waiver is not tied to the promulgation of annual RFS standards except to the extent that EPA must assume for the purpose of determining applicable volumes that it "will not need to issue a waiver[.]" 42 U.S.C. § 7545(*o*)(2)(B)(ii), (iv). Plaintiff was under no duty to intuit that, when EPA represented that the authority to waive still existed and EPA that may use the cellulosic waiver in the future, *see* 88 Fed. Reg. at 44470, EPA *actually* meant that it had no duty to do so under the statute. EPA cannot write a mandatory waiver out of the RFS by asserting that Petitioners should have challenged an action EPA did not take and correctly said it *could not* take when it promulgated the 2023 RFS standards. *Id.* at 44479.

Finally, EPA's explanation that it could not waive cellulosic biofuel volumes when it set the standard was also not a "final agency action" subject to the D.C. Circuit's review under 42 U.S.C. § 7607(b)(1). *See Royster-Clark Agribusiness, Inc. v. Johnson,* 391 F. Supp. 2d 21, 27 (D.D.C. 2005) ("Agency action is reviewable under section 307(b)(1) only to the extent that it constitutes final agency action.") (internal quotation markers and citation omitted). Finality under

the Act is judged by the same standard as finality under the Administrative Procedure Act. *Id.* (citation omitted). Agency action is final only if it (1) "marks the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citation omitted). Here, Plaintiff could not have possibly claimed EPA had failed to waive cellulosic biofuel volumes and issue credits when it challenged the 2023-2025 RFS rule because EPA had not made a final decision about whether it would exercise its cellulosic waiver authority. EPA repeatedly stated that any waiver would be the subject of future action. *See, e.g.*, 88 Fed. Reg. at 44477 (EPA "interprets [the cellulosic biofuel waiver] to mean that we must establish the cellulosic volume requirement at a level that is achievable and not expected *to require us in the future to lower the applicable cellulosic volume requirement using the cellulosic waiver authority*[.]") (emphasis added); *id.* at 44470 (EPA could exercise waiver authority "in a future action"); *id.* at 44479 (cellulosic waiver credits are unavailable "absent a future waiver of the cellulosic standard."). In sum, this case belongs in this Court.

### C. EPA (Still) Has a Nondiscretionary Duty to Waive Cellulosic Biofuel Volumes and Issue Waiver Credits for 2023.

EPA claims that this court lacks jurisdiction to require the Agency to use the mandatory cellulosic biofuel waiver provision to provide *any* relief, because no date-certain deadline exists *for 2023*. Defs. Mem. 9-12. Indeed, EPA posits that the existence or nonexistence of the duty depends not on the words of the statute, but on EPA's own actions. EPA has never articulated this novel rationale for such contradictory treatment during EPA's 14 years of implementing the cellulosic biofuel requirement. Now in litigation, EPA offers that the "single best meaning" of the waiver provision is that when EPA promulgates the cellulosic biofuel standard on time "there is a

13-month window in which the Agency may be required to apply the cellulosic waiver authority," but when EPA violates the statute and sets volumes outside that window "*only* EPA's obligation to set the cellulosic biofuel volume *without* using the cellulosic waiver authority is triggered." Defs. Mem. 10. That is not a "single" best meaning—that is one "meaning" for when EPA promulgates the RFS on time, and another "meaning" for when it does not. That is not how statutory interpretation works. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 400 (2024) (noting that each statute has a "*single*, *best meaning*" that is "fixed at the time of enactment" (emphasis added) (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018))). One violation of a mandatory duty cannot possibly relieve EPA of the obligation to comply with another. This Court should reject EPA's attempt to first contravene the statute, and then to effectively rewrite the law that EPA is required to implement.

### 1.    The Statute Has a Date-Certain Deadline That Reinforces, Rather Than Refutes, EPA's Duty to Act.

EPA posits that it controls the existence or nonexistence of a statutory duty, simply by virtue of when it promulgates an annual RFS standard. Thus, EPA maintains that "for 2023" there was no date-certain deadline, but in other cases there may be. This "heads I win, tails you lose" argument misses the mark. The statute required EPA to set the 2023 cellulosic biofuel volume by October 31, 2021. 42 U.S.C. § 7545(*o*)(2)(B)(3). That is a date-certain deadline. The statute also required EPA to decide whether a cellulosic biofuel waiver was necessary by November 30, 2022. *Id.* § 7545(*o*)(7)(D). That is also a date-certain deadline. EPA complied with neither. Plaintiff identified the statutory date-certain deadline for exercising the waiver—that EPA had made it impossible to discharge its duty to timely waive by the time EPA finally discharged the duty to set the standards does not remove the date-certain deadline from the statute.

EPA accuses Plaintiff of not explaining how EPA could be required to use the cellulosic

waiver by November 30, 2022 when "EPA was, at the same time, setting volumes under a statutory mandate *not* to use the waiver." Defs. Mem. 12. That is the wrong question, for as explained further *infra*, the statute does not "mandate" that EPA not use the waiver when it sets volumes. EPA must set standards "*based on the assumption* that the Administrator will not need to issue a waiver[.]" § 7545(*o*)(2)(B)(iv) (emphasis added). An "assumption" is not a mandate. And all this means is that EPA is to set cellulosic biofuel standards in such a way that it should not need to waive them later. In any case, Plaintiff does not contend that EPA was supposed to set and waive at the same time. Plaintiff agrees with Intervenor that the cellulosic biofuel waiver provision "creates a one-time determination each calendar year." Intv. Mem. 19. That a date-certain deadline exists, but was factually impossible to timely discharge for 2023, does not mean that Plaintiff identified the wrong date-certain or that Plaintiff asserts EPA's duty is "ongoing," *contra* Intv. Mem. 19. Rather, Congress' two-step structure requires that, even if tardy, EPA *must decide* whether the cellulosic biofuel waiver is necessary. Once EPA decides, the waiver will issue or not, and parties can challenge that decision or not (as has occurred for 2024, *see* Pet. For Review (Doc. No. 2133704)*, Coal. for Renewable Nat. Gas v. EPA,* D.C. Cir. No. 25-1183 (Sept. 4, 2025)), but the duty to make that decision has not evaporated. EPA "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

All conditions precedent that required EPA to act to grant a cellulosic biofuel waiver have been met. EPA admits that fewer than 840 million ethanol-equivalent gallons of cellulosic biofuel were produced in 2023. Defs. Resp. to Pl. SMF ¶ 17. This is less than the final volume targets EPA established for 2023 that were used to calculate requirements that apply to obligated parties, the large majority of which are AFPM members. *See* 88 Fed. Reg. at 44470. The cellulosic biofuel waiver exists for exactly this reason—that is, the nested nature of the requirements makes a

shortfall in production particularly harmful to obligated parties because only a cellulosic biofuel RIN or credit may be used for compliance. Pl. Mem. (ECF 16-1) 23. That EPA has failed by its own account to act *at all* in response to a mandatory duty imposed on the agency when statutory conditions for a waiver have been met should be the end of the jurisdictional analysis. Because the date-certain deadline exists and was unmet, this Court should enforce it and set a new deadline.

>        **2.    EPA's Duty to Implement the Cellulosic Biofuel Waiver Does Not
>               Terminate When EPA Violates Other Statutory Deadlines.**

EPA claims "there is a 13-month window in which the Agency *may* be required to apply the cellulosic waiver authority." Defs. Mem. 10 (emphasis added). After that time, EPA asserts that "the single best meaning" of the statute is that EPA no longer has a duty to waive cellulosic biofuel requirements if it promulgates the initial standards beyond that window. *Id.* In other words, under EPA's interpretation of the statute, it can write the cellulosic biofuel waiver out of the statute, just by dragging its feet. *See Wheeler*, 956 F.3d at 619-20 (Wilkins, J., concurring) (cautioning EPA against advancing a "non-sensical[]" Clean Air Act interpretation that "would protect EPA from the consequences of its nonfeasance" but "flies in the face of both reason and the statute's evident purposes").

This cannot be so. The statute first requires EPA to promulgate cellulosic biofuel standards 14 months before the year in which they take effect. 42 U.S.C. § 7545(*o*)(2)(B)(ii). Second, one month before the year in which cellulosic biofuel standards are required, EPA "shall reduce the applicable volume of cellulosic biofuel . . . to the projected volume available[.]" *Id.* § 7545(*o*)(7)(D)(i). These are two separate mandates. The failure to comply with one mandate cannot possibly cause the latter to "collapse[]" into the first. Defs. Mem. 12. No reasonable interpretation of the statute absolves EPA from the duty to waive the cellulosic standard because the Agency failed to timely issue the RFS standard within the statutorily prescribed 14-month lead-

time. *Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 158-60 (2003) (absent express statutory language "specify[ing] a consequence for noncompliance with [a] statutory [deadline]," courts will not "construe[] a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later") (citations omitted); *see also Regions Hosp. v. Shalala,* 522 U.S. 448, 459 n.3 (1998) (explaining that a Cabinet Secretary's failure to meet statutory deadline did "not mean that official lacked power to act beyond it"). EPA's contrary rationales strain credulity.

EPA has long maintained that the Agency "retains authority to promulgate volumes and annual standards beyond the statutory deadlines, even those that apply retroactively, so long as EPA exercises this authority reasonably." 88 Fed. Reg. at 44478 n.56 (citing *Ams. for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017); *Monroe Energy, LLC v. EPA*, 750 F.3d 909 (D.C. Cir. 2014); *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 154-58 (D.C. Cir. 2010)). Absent any express statutory provision that "sunsets" EPA's duty to exercise the cellulosic biofuel waiver, it makes no sense that EPA's duty to promulgate applicable volumes would continue while a duty to waive those same volumes would somehow terminate.

To cobble together a reason why EPA's new interpretation could possibly be true, EPA repeatedly asserts that 42 U.S.C. § 7545(*o*)(2)(B)(ii) imposes a "mandate" not use the cellulosic waiver authority under § 7545(*o*)(7)(D)(i). Defs. Mem. 10-12, 14. But the plain terms of the statute make clear that non-use of cellulosic waiver authority is merely an "assumption" that EPA must consider when setting RFS standards. *Id.* § 7545(*o*)(2)(B)(ii), (iv). An "assumption" is far from a "mandate." Moreover, the "assumption" required under § 7545(*o*)(2)(B)(iv) is only one of multiple criteria that EPA must evaluate in setting applicable volumes.[1] The statute states only that volumes

---

[1] When setting applicable volumes of renewable fuel for years after 2022, EPA must not only address the provisions in 42 U.S.C. § 7545(*o*)(2)(B)(iv), but also six separate categories of criteria contained within § 7545(*o*)(2)(B)(ii)(I)-

"shall be *based on* the assumption that the Administrator will not need to issue a waiver[.]" *Id.* § 7545(*o*)(2)(B)(iv) (emphasis added). The D.C. Circuit has made clear that where EPA is to determine RFS standards "based on" certain information, "Congress [does not] contemplate slavish adherence by EPA[.]" *Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 478 (D.C. Cir. 2013). Indeed, in drafting the RFS, Congress anticipated that the Administrator may "need to issue a waiver for [compliance years 2023 and later]." *See* 42 U.S.C. § 7545(*o*)(2)(B)(iv).

EPA asserts that its proposed "single best meaning" of the statute addresses the Agency's need to balance two statutory provisions and gives due weight to the language in § 7545(*o*)(2)(B)(iv) regarding EPA's authority to set volumes after 2022, which it claims is more specific and therefore prevails over the more general language in § 7545(*o*)(7)(D) regarding how the cellulosic waiver authority applies under the RFS program. Defs. Mem. 11. But *both* the obligation under the statute to set the standards by a date-certain *and later* waive cellulosic biofuel volumes by a date-certain if certain conditions are met are phrased in mandatory terms. 42 U.S.C. § 7545(*o*)(2)(B)(ii); (7)(D)(i). Nothing in the statute suggests that these two duties are mutually exclusive or must be weighed against one another when EPA fails to act timely. Whatever EPA's motivation in advancing its new statutory interpretation, it cannot reinterpret the statute by "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

Finally, Intervenor seeks to undermine the continued existence of EPA's duty to waive by arguing that the statute does not allow EPA to look at what actually happened during a compliance year in terms of cellulosic biofuel production when it acts as tardily as it did in 2023. Intv. Mem.

---

(VI). EPA must also set applicable volumes "based on a review of the implementation of the program during calendar years specified in the tables [within 7545(*o*)(2)(B)(i)]." *Id.* § 7545(*o*)(2)(B)(ii). And EPA must concurrently consider criteria for the applicable volume of advanced biofuel (which includes cellulosic biofuel). *Id.* § 7545(*o*)(2)(B)(iii).

31-34. This argument speaks more to remedy than duty, but nevertheless, as explained, EPA has a duty to set *and then* a duty to evaluate whether the conditions requiring a waiver exist. Plaintiff put forth available information indicating that the waiver conditions were met. EPA does not disagree. This Court should require EPA to act.

**3.    EPA's Proposed "Single Best Meaning" of the RFS Departs from the Agency's Prior Interpretations of the Statute with No Explanation.**

EPA's proposed "single best meaning" of the statute contradicts EPA's historical interpretation and application of its cellulosic waiver authority since 2010 and is difficult to reconcile with the Agency's recent decision to waive cellulosic biofuel standards for 2024.

*a.    EPA Has Consistently Maintained That the Cellulosic Biofuel Waiver Remains Available.*

As noted above, EPA's "single best meaning" of the statute is entirely new; it was first presented in EPA's Cross-Motion. Defs. Mem. 10-12. EPA does not cite any similar, prior interpretations of the waiver provision despite at least two prior opportunities to do so—when EPA promulgated the 2023-2025 RFS standards, and when it denied AFPM's petition to waive 2023 cellulosic biofuel volumes. EPA's argument now that it cannot act to use its cellulosic waiver authority is an impermissible post-hoc litigation position. *See New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 112 (D.D.C. 2010) (rejecting post-hoc rationalizations offered for the first time on judicial review).

First, EPA directly cited and responded to comments on the continued availability of the cellulosic biofuel waiver during its promulgation of RFS standards for 2023-2025. This occurred *after* the November 30, 2022 statutory deadline which EPA now claims serves as a hard deadline for exercising its waiver authority. In the proposed rule to promulgate the 2023-2025 RFS standards, EPA interpreted the statute to allow the Agency to grant a cellulosic biofuel waiver "in the future." 87 Fed. Reg. at 80589. In the final 2023-2025 RFS rule, EPA further reiterated the

availability of a cellulosic waiver to adjust applicable volumes established for all the years covered by the rule and to thereby also make credits available in "a future action." 88 Fed. Reg. at 44479; *see also* Pl. Mem. 24-25 (citing EPA's Response to Comments maintaining "the view that [EPA's] waiver authorities remain available as applied to the volumes set in this action" and noting that EPA "would make cellulosic waiver credits available, consistent with statute" if it "in the future waive[s] the cellulosic volumes under CAA section 211(*o*)(7)(D)").

Second, EPA never mentioned that its authority to exert its cellulosic waiver authority was time-limited when it denied Plaintiff's petitions for a waiver of the 2023 cellulosic biofuel standards. *See generally* EPA Denial, Ex. 4 (ECF 16-3). While EPA denied Plaintiff's petitions on other grounds, it did not state then, as it does now, that it lacked authority to waive standards because such action would have been outside the 13-month window in which EPA may properly exercise its waiver authority under § 7545(*o*)(7)(D)(i). If such a window existed, this "defense" to Plaintiff's petition would have been available at the time of the denial.

> b. *EPA Waived 2024 Cellulosic Biofuel Applicable Volumes Under Circumstances Similar to 2023.*

Less than three months ago, EPA used its cellulosic waiver authority to waive standards for the 2024 compliance year, nearly two years after it initially (and tardily) promulgated such standards. 90 Fed. Reg. at 29751. EPA did so based on data showing that 80 million fewer RINs were generated for cellulosic biofuel in 2024 compared to the cellulosic biofuel standard EPA set. The same conditions exist for 2023: cellulosic biofuel volume requirements exceed projected cellulosic biofuel production by a similar amount, at least 65 million according to one EPA estimate. *Supra* at 6. Moreover, EPA partially waived the 2024 cellulosic biofuel volumes based on a new projection of cellulosic biofuel production and RIN generation data for 2024, not projections of cellulosic biofuel production that it had used to promulgate standards for 2024. 90

Fed. Reg. at 29751-52. EPA's new litigation position fails to acknowledge, much less explain, how the Agency believes it can reconcile its disparate treatment of cellulosic biofuel in 2023 and 2024.

EPA acted in a deliberate fashion in waiving 2024 cellulosic biofuel standards, responding to numerous comments both supporting and opposing its proposed action. *Id.* at 29753-54. And EPA specifically responded to comments that it lacked authority to waive cellulosic biofuel standards retroactively, interpreting § 7545(*o*)(2)(D)(iv) as *supporting* the continued availability of the cellulosic waiver:

> [S]tatutory references indicate the continuing availability of the cellulosic waiver authority to reduce the volumes EPA sets under CAA section 211(o)(2)(B). First, CAA section 211(o)(7)(D) indicates that EPA is to reduce the cellulosic biofuel volume "for any year for which the projected volume of cellulosic biofuel is less than the applicable volume." The "any year" language is expansive and is not limited by any other language in the provision, indicating that Congress intended for it to be available for all years of the RFS program. Second, CAA section 211(o)(2)(B)(iv) indicates that EPA shall determine cellulosic volumes "under the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D)." While this language primarily provides guidance to EPA on how to determine volumes under CAA section 211(o)(2)(B)(ii), it also contemplates the continued existence of the CAA 211(o)(7)(D) cellulosic waiver authority in the set years. This is also consistent with the reference in CAA section 211(o)(7)(D) directing EPA to compare the projected production of cellulosic biofuel to the cellulosic biofuel volume "required under paragraph (2)(B).

*Id.* at 29753-54.

EPA also noted that it "has implemented the cellulosic waiver authority to reduce the cellulosic biofuel volume after the November 30 deadline on several occasions." *Id*. at 29754. EPA cited three different rulemakings where EPA exercised its waiver authority *after* November 30 of the preceding calendar year, including for the 2013, 2014, and 2015 standards; and for the 2020 and 2021 standards. *Id.* at 29754 n.17. EPA in no way suggested, as it does now, that the November 30 deadline provides an immutable barrier for granting a cellulosic biofuel waiver.

As to cellulosic biofuel waivers hinging on "projections," which Intervenor cites as a reason why a cellulosic waiver is unavailable now, Intv. Mem. 23, EPA responded that "the best reading of the statute is instead that there are projections necessary to determine the 'volume of . . . production' and the 'volume available,' both when EPA acts in a timely manner by November 30 of the preceding year *and when EPA waives the volume requirement after the November 30 date.*" 90 Fed. Reg. at 29754 (emphasis added) (citation omitted). EPA also noted that while the term "projected" in the statute requires forward-looking estimates, "*it does not follow that the statutory language prohibits EPA from acting after November 30.*" *Id.* (emphasis added).

Effectively, EPA now proffers an interpretation of the statute that relieves EPA of any duty in 2023 while preserving EPA's authority in 2024—the quintessential too-thinly sliced salami.

### D.    Policy Considerations Fail to Overcome Statutory Text.

EPA has historically exercised its cellulosic biofuel waiver authority even when it missed RFS deadlines. 90 Fed. Reg. at 29754 & n.17 (noting EPA reduced cellulosic biofuel volumes after the November 30 deadline for compliance years 2013-2015 and 2020-2021). In all cases, EPA cited its authority to carry out its overdue statutory obligations so long as it does so reasonably, including with respect to the promulgation of the 2023 RFS standards. *See* Defs. Mem. 10, n.3; *see also* 88 Fed. Reg. at 44478. Here, EPA must fulfill its overdue obligation to waive 2023 cellulosic biofuel volumes and make credits available for purchase. Indeed, EPA has not claimed that it is impossible for the Agency to waive applicable volumes for cellulosic biofuel for 2023, only that it will take some amount of time to do so. Dunham Decl. (ECF 18-3) ¶¶ 17-18. Any such considerations must yield to a statutory duty to act.

Intervenor attempts to provide other non-statutory justifications to undermine EPA's use of the cellulosic biofuel waiver for 2023. Intervenor cites the D.C. Circuit's opinion in *Americans for Clean Energy* and claims that the general "market forcing" intent of the RFS means that Congress

somehow constrained "when and how the cellulosic waiver is used." Intv. Mem. 28. But the D.C. Circuit in that case noted that "the fact that EPA thinks a statute would work better if tweaked does not give EPA the right to amend the statute." 864 F.3d at 712 (citing *Util. Air Regul. Grp.*, 573 U.S. at 325). Indeed, the Supreme Court has made clear that "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Regul. Grp.*, 573 U.S. at 325. So too here. Any "market forcing" purpose of the RFS yields to the explicit statutory availability of the cellulosic biofuel waiver.

Intervenor also argues that a cellulosic waiver should not be allowed "to circumvent the requirements for a general waiver based on inadequate domestic supply." Intv. Mem. 26. But the mandatory cellulosic waiver and discretionary general waivers allowed for severe economic or environmental harm and inadequate domestic supply are clearly distinct actions, contained in separate provisions of the RFS. *Compare* 42 U.S.C. § 7545(*o*)(7)(D) (cellulosic waiver *requiring* EPA to waive applicable volume of cellulosic biofuel if certain conditions are met) *with id.* § 7545(*o*)(7)(A) (general waiver *permitting* EPA to waive national quantity of renewable fuel if certain conditions are met). One waiver authority does not displace or supersede the other.

Intervenor also tries to parse between cellulosic biofuel "production" and "use" as if this distinction provided some meaningful difference in how the cellulosic waiver is to be applied. *See* Intv. Mem. 26. On the basis of this flawed distinction, Intervenor argues that allowing the cellulosic biofuel waiver to be used "based on a claim of RIN generation would allow EPA to avoid general waiver requirements" including a requirement to consult other governmental entities. *Id.* But for purposes of the cellulosic biofuel waiver and RFS compliance, the only "production" of cellulosic biofuel relevant here is that which meets the definition of cellulosic biofuel under 42 U.S.C. § 7545(*o*)(1)(E)—fuel that can be used as transportation fuel as defined in

§ 7545(*o*)(1)(L). Renewable fuel obligations only apply to obligated parties on the basis of cellulosic biofuel used as transportation fuel; only that form of cellulosic biofuel production qualified to generate RINs can be used for compliance.[2]

Intervenor's argument that discretionary waivers under § 7545(*o*)(7)(A) displace mandatory cellulosic biofuel waivers under § 7545(*o*)(7)(D) is thus based on a false premise. EPA regulations requiring a demonstration that renewable natural gas is actually used for transportation fuel before generating RINs effectuate the requirement that renewable fuel regulations "ensure that transportation fuel sold or introduced into commerce in the United States . . . contains at least the applicable volume of . . . cellulosic biofuel[.]" § 7545(*o*)(2)(A). Once renewable natural gas enters a distribution pipeline, it can no longer be tracked to use by a vehicle versus some other use (*e.g.*, home heating). Thus, EPA has promulgated regulations to track and verify its end use as a method to ascertain how much renewable natural gas is produced each year that qualifies under the RFS as renewable fuel. *See* 40 C.F.R. § 80.1426(f). Such requirements have nothing to do with the interpretation of EPA's waiver authority.

Finally, Intervenor attempts to relitigate an issue previously decided by the D.C. Circuit. Intervenor accuses AFPM of claiming that "the mandatory duty allows EPA to ignore the availability of prior year RINs that can be used for compliance." Intv. Mem. 33. But in the context of the cellulosic waiver, the D.C. Circuit has held that "[t]he estimate on which the 'projected volume of . . . production' must be made, then, is an estimate of actual fuel use, not carryover RINs. It follows that the 'projected volume available' also does not encompass carryover RINs." *Sinclair Wyo. Refin. Co. v. EPA*, 101 F.4th 871, 885 (D.C. Cir. 2024). Quite simply, EPA is to

---

[2] "Transportation fuel" is defined in § 7545(*o*)(1)(L) to mean "fuel *for use* in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines[.]" (emphasis added). The RFS also requires that EPA regulations "ensure that transportation fuel sold or introduced . . . on an annual average basis, *contains at least the applicable volume of renewable fuel*[.]" § 7545(*o*)(2)(A)(i) (emphasis added).

exercise its cellulosic waiver authority based on the production of cellulosic biofuel within 2023 that generated RINs that can be used for compliance. That production does not include prior RINs, nor is EPA required to look to other discretionary waivers when the mandatory cellulosic biofuel waiver applies on its face.

## II.    THE COURT SHOULD COMPEL EPA TO EXERCISE THE CELLULOSIC WAIVER AND MAKE AVAILABLE CELLULOSIC BIOFUEL CREDITS BY MARCH 31, 2026.

When EPA fails to discharge a nondiscretionary duty by the statute's express deadline, district courts have the "exclusive jurisdiction" to "order the Administrator to perform" that duty, *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 63 (D.D.C. 2004), and in doing so may "exercise [their] equity powers to set enforceable deadlines[.]" *Sierra Club v. Johnson,* 444 F. Supp. 2d 46, 52 (D.D.C. 2006) (cleaned up). If the Court agrees with Plaintiff on the merits, it should issue a declaratory judgment recognizing EPA's nondiscretionary duties under 42 U.S.C. § 7545(*o*)(7)(D)(i)-(ii), and order EPA to issue a final rule by March 31, 2026[3] to waive applicable cellulosic biofuel volumes to the projected amount available in 2023 and make cellulosic biofuel credits available for purchase at a price consistent with § 7545(*o*)(7)(D)(ii). EPA has made no compelling case that it needs more time than that.

When an agency seeks even more time to comply with a mandatory statutory deadline, the agency "bears a heavy burden" to demonstrate that it "has exercised utmost diligence in its efforts to comply with the statute" and that earlier completion of its overdue obligations would be "impossible." *Johnson*, 444 F. Supp. 2d at 53, 58 (internal quotation marks and citations omitted). EPA has failed to carry its burden.

First, EPA has not shown, or even alleged, that it exercised "utmost diligence" in its efforts

---

[3] Even this deadline would not avoid all future harm, for obligated parties must demonstrate compliance with the 2024 standard by December 1, 2025. 40 C.F.R. § 80.1451 Tbl. 1.

to meet the RFS statutory deadlines. *Id.* To the contrary, EPA ignored two clear statutory deadlines, including to promulgate 2023 cellulosic biofuel standards by October 31, 2021, § 7545(*o*)(2)(B)(ii), and to waive such standards by November 30, 2022, *id.* § 7545(*o*)(7)(D)(i). EPA did not even begin the process of complying with setting the cellulosic biofuel standards until both deadlines had passed. *See* Proposed Standards for 2023-2025, 87 Fed. Reg. 80582. But EPA's failure to meet applicable RFS deadlines is not new. To the contrary, EPA has been chronically late in setting RFS volumes since the inception of the program. *See* 87 Fed. Reg. 39600 (July 1, 2022) (missed deadline for setting volumes for 2021-2022 by 21 months and 9 months, respectively); 80 Fed. Reg. 77420 (Dec. 14, 2015) (missed deadlines for setting volumes for 2014, 2015 and 2016 by over 24 months, 12.5 months, and 0.5 months, respectively). EPA asserts that it now needs more time to issue the cellulosic biofuel waiver and make credits available for 2023 in part because RFS program staff are working on *another late* rulemaking to set volumes for 2026 and 2027, which have a statutory deadline of October 31, 2024 and October 31, 2025, respectively. Defs. Mem. 16; Dunham Decl. ¶ 24. This Court should not defer to EPA's proposed schedule to fulfill its nondiscretionary duty where the Agency has continuously flouted its existing statutory deadlines under the RFS program. *See Johnson*, 444 F. Supp. 2d at 56 (deference to agency about appropriate rulemaking procedures is "inappropriate" where agency has "failed to fulfill [its] statutory obligation" to act by a date-certain); *see also Sierra Club v. Browner*, 130 F. Supp. 2d 78, 95 (D.D.C. 2001) ("allowing for the flexible schedule that EPA proposes . . . would effectively amount to condoning a fully discretionary approach to a nondiscretionary duty").

Second, EPA has not established, or even alleged, that it would be impossible to fulfill its nondiscretionary duties at an earlier date. Rather, EPA asserts that an October 31, 2026 deadline is appropriate because retroactively reducing cellulosic biofuel volumes and issuing credits would

be "complex and time-consuming" and there are simultaneous demands on RFS staff time. Defs. Mem. 15; Dunham Decl. ¶ 13. EPA's generalized complaints about the "complex[ity]" and "scope" of waiving cellulosic biofuel volumes and "that there are competing demands on [its] resources, do not amount to a claim of impossibility sufficient to justify a departure from a Congressional mandate." *Nat. Res. Defs. Council, Inc. v. EPA*, 797 F. Supp. 194, 197 (E.D.N.Y. 1992); *see also Johnson*, 444 F. Supp. 2d at 58 (finding the complexity of EPA's nondiscretionary duty and the existence of competing regulatory priorities as insufficient justification for additional delay under EPA's proposed compliance schedule).

EPA cites the various review processes underlying rulemaking, including internal agency review, inter-agency review through the Office of Management and Budget ("OMB"), and public notice and comment. Defs. Mem. 15-16. But these processes would not make it impossible for EPA to issue a final rule by March 31, 2026. EPA can expedite its internal review processes to promulgate new rules and has frequently done so. As relevant here, EPA took less than seven months between issuing its notice of proposed rulemaking and its final rule to partially waive 2024 cellulosic biofuel volumes. *See* 89 Fed. Reg. 100442; 90 Fed. Reg. 29751. And OMB's review of draft proposed regulations under Executive Order 12866 cannot justify additional delay because it makes clear that such review cannot interfere with a clear directive of Congress or an order by this Court. 58 Fed. Reg. 51735, 51741 (Oct. 4, 1993) (when regulatory action is subject to statutory or court-imposed deadline, agency shall permit sufficient time for OMB review "*to the extent practicable*") (emphasis added). Where, as here, EPA ignored applicable statutory deadlines, it "should be required to compensate for the delays it caused by accelerating" rulemaking to waive 2023 cellulosic biofuel volumes and make credits available for purchase. *Nat. Res. Defs. Council, Inc. v. EPA,* 22 F.3d 1125, 1136-37 (D.C. Cir. 1994); *see also Nat. Res. Defs. Council, Inc. v. Train,*

510 F.2d 692, 712 (D.C. Cir. 1975) (court order "should serve like adrenalin to heighten the response and to stimulate the fullest use of resources").

Importantly, EPA already has all the data that is necessary to calculate the volume of cellulosic biofuel that it must waive to align EPA-determined applicable volumes with EPA's projections of the volumes of fuel available in 2023. EPA has information on the number of RINs generated in 2023, and it has the data needed to determine the volume of gasoline and diesel upon which individual companies calculated their obligation to retire RINs. Indeed, EPA partially waived the 2024 cellulosic biofuel volume requirements by relying on reported RIN generation data. *See* 90 Fed. Reg. at 29759, Table 1 to Paragraph (a) – Annual Renewable Fuel Standards; *see also id.* at 29755 (relying on "RIN generation data for 2024" to project RINs generated and calculate volume to be waived). EPA has similar data for 2023 in its full possession as well as all information necessary to calculate the price of cellulosic biofuel credits.

Intervenor misses the plot in arguing that "[r]equiring [r]eopening of 2023 [c]ompliance [r]eports [i]s [n]ot [a]uthorized." Intv. Mem. 36. First, Intervenor provides no authority for such an assertion and does not support that argument in the body of its brief. Second, Intervenor really seems to argue that discharging the duty is complicated. Perhaps, but the order to discharge the duty itself is precisely the sort of "ministerial act[]" within this Court's jurisdiction to compel under § 7604 of the Act. *See Env't Def.*, 329 F. Supp. 2d at 63 (quoting *N.Y. Pub. Int. Rsch. Grp.*, *Inc v. Whitman*, 214 F. Supp. 2d 1, 3 (D.D.C. 2002)). This Court has repeatedly recognized that its "power [under § 7604 is limited to requiring EPA to undertake nondiscretionary actions required by the statute." *Accord Browner*, 130 F. Supp. 2d at 89. And EPA has explained that waiving cellulosic biofuel volumes "implements [congressional] mandate(s) … *without the exercise of any policy discretion by EPA.*" 79 Fed. Reg. 25025, 25030 (May 2, 2014) (emphasis added). Thus, if

the Court finds that EPA failed to discharge its nondiscretionary duty to waive cellulosic biofuel volumes and issue credits, an appropriate remedy would be an order compelling EPA to perform those duties by a certain deadline–and EPA seems to agree. Defs. Mem. 14. That EPA may need to make additional decisions on how to carry out the Court's order (*e.g.*, by determining the process to implement revised requirements for 2023) does not preclude the Court from ordering EPA to fulfill its nondiscretionary duties in the first instance.

Because EPA has failed to demonstrate that earlier completion of its overdue obligations is impossible, the Court should order EPA to act by March 31, 2026 to minimize the disruption caused by EPA's delay. Annual compliance reports for 2025 cellulosic biofuel standards are due by March 31, 2026, *see* 40 C.F.R. § 80.1451(f)(1)(i)(A). An aligned order for EPA's action here would allow obligated parties to address their compliance obligations for 2023 through 2024 *before* compliance with 2025 standards is required. This would avoid the potential need to reopen compliance for 2025 later, avoiding just the type of complications that EPA alleges will require over a year's time to implement. Dunham Decl. ¶¶ 16-18. Pursuant to 42 U.S.C. § 7604(d), the Court should also award Plaintiff its costs of litigation, including reasonable attorney's fees.

## CONCLUSION

For all these reasons and for those stated in Plaintiff's opening memorandum, the Court should deny EPA's and Intervenor's cross-motions to dismiss and grant Plaintiff's motion for summary judgment. The Court should also declare that EPA has a nondiscretionary duty to waive applicable volumes of cellulosic biofuel when such volumes are more than the projected production of cellulosic biofuel in any given year, even if EPA misses the original deadline to promulgate volume requirements, and direct EPA to issue a final rule by March 31, 2026 to reduce the applicable volume of cellulosic biofuels for the 2023 compliance year and make cellulosic biofuel credits available for purchase.

Dated: September 17, 2025

Respectfully submitted,


_/s/ Elizabeth B. Dawson_
Robert Meyers (No. 294298)
Elizabeth B. Dawson (No. 230818)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2500

*Attorneys for Plaintiff American Fuel &*
*Petrochemical Manufacturers*