IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, )<br><br>*Plaintiff,* )<br><br>v. )<br><br>LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and U.S. ENVIRONMENTAL PROTECTION AGENCY, )<br><br>*Defendants,* )<br><br>COALITION FOR RENEWABLE NATURAL GAS, )<br><br>*Defendant-Intervenor.*) | Case No.<br>1:24-cv-02361 (RBW) |

**REPLY IN SUPPORT OF CROSS-MOTION OF
COALITION FOR RENEWABLE NATURAL GAS
TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Jonathan Y. Ellis
Grace Greene Simmons
MᴄGᴜɪʀᴇ Wᴏᴏᴅs LLP
888 16th St. N.W.
Suite 500
Washington, D.C. 20006
T 202 828-2887
*jellis@mcguirewoods.com*
*gsimmons@mcguirewoods.com*

Sandra P. Franco
DC Bar Number: 467091
Franco Environmental Law, LLC
600 Pennsylvania Avenue, SE
Unit 15577
Washington, DC 20003
T 202 256-6115
*sandra@francoenvironmentallaw.com*

*Counsel for Coalition for Renewable Natural Gas*

Dated: December 22, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................ 4

I.    Plaintiff Does Not Have Standing Because Its Members' Claimed Harms Are
      Traceable to the Original Setting of the 2023 Cellulosic Biofuel Volume
      Requirement, Not EPA's Refusal to Retroactively Waive That Volume .......................... 4

II.   Plaintiff's Challenge Had to Be Brought in the D.C. Circuit, Not This Court ................. 9

III.  EPA Does Not Have the Authority to Retroactively Exercise the Cellulosic
      Waiver, Much Less a Nondiscretionary Duty to Do So ...................................... 14

IV.   The Only Possible Remedy Is Requiring EPA to Confirm the Projected Volume
      of Cellulosic Biofuel ................................................................... 20

CONCLUSION ..................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Ams. for Clean Energy v. EPA,*
    864 F.3d 691 (D.C. Cir. 2017) .................................................................................11, 18, 20

*Am. Petroleum Inst. v. EPA,*
    706 F.3d 474 (D.C. Cir. 2013) .........................................................................................12

*Am. Petroleum Inst. v. U.S. Dep't of Interior,*
    823 F. App'x 583 (10th Cir. 2020) ...................................................................................6

*Am. Wood Preservers Inst. v. EPA,*
    No. 88-770 (RCL), 1989 U.S. Dist. LEXIS 6933 (D.D.C. June 21, 1989) ...........................12

*Arizona v. EPA,*
    77 F.4th 1126 (D.C. Cir. 2023) ........................................................................................6

*Barnhart v. Peabody Coal Co.,*
    537 U.S. 149 (2003) .......................................................................................................19

*Ctr. for Biological Diversity v. EPA,*
    141 F.4th 153 (D.C. Cir. 2025) .............................................................................5, 11, 12

*Garnett v. Zeilinger,*
    323 F. Supp. 3d 58 (D.D.C. 2018) ....................................................................................7

*Growth Energy v. EPA,*
    5 F.4th 1 (D.C. Cir. 2021) ...............................................................................................13

*Hoggard v. Nationstar Mortg. LLC,*
    Civil Action No. 17-99 (TJK), 2021 WL 7162301, 2021 U.S. Dist. LEXIS 254141
    (D.D.C. Dec. 30, 2021) ....................................................................................................5

*Hudson v. Haaland,*
    843 F. App'x 336 (D.C. Cir. 2021) ...................................................................................8

*Huron v. Berry,*
    12 F. Supp. 3d 46 (D.D.C. 2013), *aff'd,* 809 F.3d 1274 (D.C. Cir. 2016) ...............................7

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) .......................................................................................................19

*Med. Waste Inst. v. EPA,*
    645 F.3d 420 (D.C. Cir. 2011) .........................................................................................13

# TABLE OF AUTHORITIES
### (cont.)

Page(s)

*Monroe Energy, LLC v. EPA,*
   750 F.3d 909 (D.C. Cir. 2014) ...............................................................................20

*Nat'l Petrochemical & Refiners Ass'n v. EPA,*
   630 F.3d 145 (D.C. Cir. 2010) ...............................................................................20

*NRDC v. Wheeler,*
   955 F.3d 68 (D.C. Cir. 2020) .................................................................................14

*Petro-Chem Processing, Inc. v. EPA,*
   866 F.2d 433 (D.C. Cir. 1989) .................................................................................7

*Sierra Club v. McCarthy,*
   61 F. Supp. 3d 35 (D.D.C. 2014) ...........................................................................10

*Sierra Club v. Wheeler,*
   956 F.3d 612 (D.C. Cir. 2020) ...............................................................................10

*Sinclair Wyo. Refin. Co. LLC v. EPA,*
   101 F.4th 871 (D.C. Cir. 2024) ..............................................................................18

*(Docketed) Clean Fuels All. Am. v. Zeldin,*
   Civil Action No. 1:24-cv-03572 (D.D.C. filed Dec. 20, 2024) ..............................10

*(Docketed) Growth Energy v. EPA,*
   Civil Action No. 1:22-cv-01191 (D.D.C. Apr. 29, 2022) .......................................10

**FEDERAL STATUTES AND LEGISLATIVE MATERIALS**

42 U.S.C. § 7545(o)(1)(E) .........................................................................................1

42 U.S.C. § 7545(o)(2)(B) ...............................................................................1, 11, 13

42 U.S.C. § 7545(o)(3)(A) .......................................................................................12

42 U.S.C. § 7545(o)(3)(B) ...............................................................................1, 12, 15

42 U.S.C. § 7545(o)(7)(A) .......................................................................................19

*42 U.S.C. § 7545(o)(7)(D) .............................................1, 3, 11, 12, 15, 17, 21

42 U.S.C. § 7545(o)(7)(F) ........................................................................................17

42 U.S.C. § 7607(b) ...................................................................................................9

# TABLE OF AUTHORITIES
## (cont.)

**Page(s)**

**FEDERAL ADMINISTRATIVE MATERIALS**

40 C.F.R. § 80.1405 ...................................................................................................19

40 C.F.R. § 80.1407 .....................................................................................................8

40 C.F.R. § 80.1428 .....................................................................................................8

40 C.F.R. § 80.1451 .....................................................................................................7

40 C.F.R. § 80.1456 .....................................................................................................8

75 Fed. Reg. 14670 (Mar. 26, 2010).........................................................................15

79 Fed. Reg. 25025 (May 2, 2014)............................................................................16

80 Fed. Reg. 77420 (Dec. 14, 2015)..........................................................................17

87 Fed. Reg. 39600 (July 1, 2022).................................................................6, 16, 17

87 Fed. Reg. 80582 (proposed Dec. 30, 2022) ....................................................11, 12

88 Fed. Reg. 44468 (July 12, 2023)..........................................................1, 9, 12, 13, 15

90 Fed. Reg. 29751 (July 7, 2025).......................................................................16, 17

90 Fed. Reg. 41829 (Aug. 27, 2025)...........................................................................8

90 Fed. Reg. 52385 (Nov. 20, 2025)...........................................................................8

EPA, *Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes - Response to Comments* (2023), https://www.regulations.gov/document/EPA-HQ-OAR-2021-0427-1114 ...................................................................................17

RFS Small Refinery Exemptions, Table SRE-1, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions (last updated Dec. 18, 2025) 19

EPA, Available RINs – RIN Holdings Report, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/available-rins (last updated Dec. 10, 2025)............................7

EPA, RIN Use - Total Retirements by Fuel (D Code) Report, Reason Code – Demonstrate Annual Compliance, Refiner, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rin-use (last updated Dec. 10, 2025) ......................................7

*Authorities chiefly relied upon are marked with an asterisk.

## INTRODUCTION

The Renewable Fuel Standard program can be complicated, but the present dispute is not. Each year, petroleum refineries and importers (i.e., obligated parties) generally must sell or introduce into commerce a minimum amount of renewable fuel into the transportation fuel market. By statute, the U.S. Environmental Protection Agency ("Defendant" or "EPA") is required to set that applicable volume, starting in compliance year 2023, at least 14 months prior to the compliance year. 42 U.S.C. § 7545(o)(2)(B)(ii). The total volume of renewable fuel is comprised of different types of biofuels, including cellulosic biofuel, which Congress sought to ambitiously grow and requires the greatest amount of lifecycle greenhouse gas emissions reductions. *Id.* §§ 7545(o)(1)(E), (2)(B)(i). Cellulosic biofuel, in turn, includes renewable natural gas, which today makes up most of the required volume of cellulosic biofuel under the program. *See* Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes, 88 Fed. Reg. 44468, 44481 (July 12, 2023). EPA then sets percentage standards that obligated parties use to determine their individual renewable volume obligations that, in the aggregate, are to meet the overall required volumes by one month prior to the start of the compliance year—by November 30, to be exact. 42 U.S.C. § 7545(o)(3)(B). At that time, if the projected production of cellulosic biofuel is less than the previously set applicable volume, EPA reduces the required volume to the projected volume available, which is then used to set the percentage standard for cellulosic biofuel. *Id.* § 7545(o)(7)(D)(i); Defs.' Reply at 1, 5 (Dkt. No. 29).

For the 2023 compliance year, EPA blew past its statutory deadlines; it did not set the minimum applicable volumes or the percentage standards until July *2023*, midway through the year. In doing so, EPA based the required cellulosic biofuel volume on the ongoing and expected production for that year. It did not reduce the cellulosic biofuel volume using its so-called

"cellulosic waiver authority" because there was no need to do so; the volume had been set based on the most up-to-date projections—well after the intended November 30, 2022 date. Plaintiff American Fuel & Petrochemical Manufacturers ("Plaintiff" or "AFPM"), representing certain petroleum refiners, challenged, among other things, the 2023 cellulosic biofuel volume in the D.C. Circuit, and the D.C. Circuit upheld the volume as reasonable. Plaintiff also petitioned EPA to use a cellulosic waiver to retroactively reduce the cellulosic biofuel volume requirement for 2023. EPA denied that request in March of 2024, and Plaintiff appealed again to the D.C. Circuit; that case is currently being held in abeyance. Plaintiff then filed this present citizen suit, alleging that EPA has failed to perform its "nondiscretionary duty" to retroactively reduce the required cellulosic biofuel volume for compliance year 2023. Compl. at 1 (Dkt. No. 1).

As reflected in its Notice of Intent to Sue and Complaint, however, Plaintiff does not complain that EPA missed the November 30, 2022 deadline to determine whether the cellulosic waiver authority was triggered. Instead, Plaintiff insists that EPA had an obligation *after* the end of the compliance year to reduce the volume requirements to mirror *actual use* of cellulosic biofuel, rather than *projected production*. This argument fails at every turn. Indeed, Plaintiff agrees with Intervenor that determining whether the cellulosic biofuel waiver is triggered is a "one-time determination," and EPA agrees there is no ongoing duty to confirm its projections. Pl.'s Opp'n at 11 (Dkt. No. 25); Defs.' Reply at 1. The bottom line is that EPA made the "one-time determination" the statute requires when EPA set the percentage standard in July of 2023. The waiver was not triggered, and nothing more was required of EPA.

None of Plaintiff's arguments to the contrary is persuasive. Plaintiff claims that EPA could not have used the cellulosic waiver authority when it set the percentage standards because it was late in setting the volumes. But this conflates the volume-setting process with the distinct standard-

2

setting process. The standard-setting process and cellulosic waiver determination are designed to occur at the same time, as it was here. Plaintiff next claims that EPA must exercise the cellulosic waiver retroactively simply because the statute says "shall," asserting that statutory structure and purpose—traditional tools of statutory construction—are immaterial here. But the statute must be read in a manner that does not undermine the entire market-forcing design of the program. Finally, Plaintiff tries to assert that the waiver must be based on actual use rather than projected production, claiming that the difference between production and use is meaningless here. But these are key distinctions in determining whether the waiver has been triggered.

In short, nothing in the statute permits, much less requires, EPA to retroactively reduce the required volume after a compliance year. The deadline for reducing the required volume, after all, is before the compliance year starts, by November 30 of the prior year. 42 U.S.C. § 7545(o)(7)(D)(i). Not only is a retroactive reduction not permitted by the plain text of the statute, but it runs counter to the statute's purposes. With this program, Congress intended to force petroleum companies to incorporate increasing volumes of renewable fuels into the transportation fuel market. The standards are set ahead of time to encourage appropriate investment by cellulosic biofuel producers, including the renewable natural gas industry, and to ensure that obligated parties act accordingly. If EPA were required to reduce the required volume *after* the compliance year is over based on actual production, the standards would provide no incentive for obligated parties to take any action to comply. Instead, it only would reward petroleum companies for dragging their feet incorporating renewable fuels into the transportation fuel market.

All that aside, this Court need not reach the merits, for this case is not properly before the Court. For one, Plaintiff does not have standing to challenge EPA's refusal to retroactively reduce the volume. Plaintiff has not even tried to show that the claimed injuries are traceable to that refusal

3

to retroactively reduce the volume, rather than EPA's setting of the volume in the first place. Nor has Plaintiff articulated what effective relief this Court could grant to relieve those purported harms. It is nearly 2026; not only has the compliance deadline for 2023 long passed, but any carryover credits that Plaintiff's members could have used are now expired. Moreover, even if Plaintiff had standing, it still could not bring this citizen suit, as EPA agrees. Defs' Reply at 2, 10-12. The Clean Air Act generally requires that challenges under the renewable-fuel program be brought in the D.C. Circuit. Indeed, Plaintiff has brought two such challenges to the 2023 cellulosic biofuel requirements in that court already. Plaintiff cannot circumvent those limits on judicial review by framing its current suit—its third attempt to get out from the 2023 requirements—as a complaint about EPA failing to perform a nondiscretionary duty. Plaintiff could have and should have raised its objection about EPA not using its cellulosic waiver authority to reduce the volume in its initial challenge in the D.C. Circuit. This Court should dismiss Plaintiff's suit for lack of jurisdiction or, in the alternative, grant summary judgment to Defendant-Intervenor Coalition for Renewable Natural Gas ("Intervenor") and deny summary judgment to Plaintiff.

## ARGUMENT

I.    **Plaintiff Does Not Have Standing Because Its Members' Claimed Harms Are Traceable to the Original Setting of the 2023 Cellulosic Biofuel Volume Requirement, Not EPA's Refusal to Retroactively Waive That Volume.**

Plaintiff's attempts to mischaracterize Intervenor's standing argument notwithstanding, Plaintiff still has not shown that any of its members suffered a cognizable harm that is (1) traceable to EPA's refusal to retroactively reduce the 2023 cellulosic biofuel volume, rather than EPA's original setting of the volumes, and (2) can now be redressed by this Court. *See* Intervenor Mem. at 13-16 (Dkt. No. 23-1). Standing demands that a plaintiff identify a harm that stems from the challenged agency action (or inaction). At bottom, Plaintiff's complaint is that EPA made the cellulosic biofuel volume too high prior to the 2023 compliance year. That harm stems from EPA's

setting the 2023 volume and percentage standards back in July 2023 and declining to exercise the cellulosic waiver then—not from EPA's refusal in 2024 to retroactively issue a waiver. Plaintiff offers nothing to tie its harm to the latter rather than the former. That is fatal to its suit. "A plaintiff cannot satisfy the fairly traceable requirement when a sufficient cause independent of the defendant's *challenged* conduct would have inflicted the injury." *Hoggard v. Nationstar Mortg. LLC*, Civil Action No. 17-99 (TJK), 2021 WL 7162301, 2021 U.S. Dist. LEXIS 254141, at *18 (D.D.C. Dec. 30, 2021) (emphasis added and internal quotation marks omitted). Likewise, "a plaintiff cannot satisfy the redressability requirement when a favorable judicial decision will have no real effect on redressing the injury, such as when there is a sufficient cause for the injury that would exist even if defendant's *challenged* conduct had never occurred." *Id.* (emphasis added and internal quotation marks omitted). It was, thus, incumbent on Plaintiff to establish at least one of its members suffered an injury in fact that stems from EPA's failure to issue a retroactive cellulosic biofuel waiver and that such harm could be redressed by this Court.

Plaintiff insists that it does not have to tie the claimed harm to any particular member or to EPA's refusal to retroactively issue waiver, rather than its prior conduct in setting the volume, because it is "self-evident" that obligated parties have "standing to challenge annual RFS rulemakings." Pl.'s Opp'n at 3 (citing *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153 (D.C. Cir. 2025)). That only proves the point. The appropriate time to challenge EPA's asserted failure to use its cellulosic waiver authority for 2023 was when EPA finalized the 2023 standards in July of 2023.[1] Defs.' Reply at 10-12; Intervenor Mem. at 16-18. Indeed, Plaintiff did challenge that

---

[1] Plaintiff also did not dispute that EPA underestimated gasoline and diesel fuel production when it set the 2023 standards, which was another cause of the harms Plaintiff now alleges to support standing. Intervenor Mem. at 34.

annual rulemaking—and lost. It cannot later demand that EPA retroactively change that rule and then claim that it was that refusal that caused its injury.

This is especially so given that Plaintiff did not demand that EPA retroactively reduce the volumes until after the compliance year, meaning that nothing about that refusal could have impacted market conditions or a refiner's actions during the compliance year. *Cf.* Pl.'s Opp'n at 5-6; *see, e.g.,* Renewable Fuel Standard (RFS) Program: RFS Annual Rules, 87 Fed. Reg. 39600, 39617 (July 1, 2022) ("[O]nly prospective requirements have a significant chance of affecting actual renewable fuel use."). At that point, all the renewable fuel had been produced and purchased, and RINs had been purchased and retired. Nothing about EPA's later refusal to belatedly reduce those volumes could change that. That futility is only made more clear by the timing of this suit; standing is assessed at the time of the complaint (not the time of a petition to the agency, *cf.* Pl.'s Opp'n at 5), and Plaintiff waited until August 2024 to bring this suit, eight months past the end of the compliance year. At that point, the 2023 compliance year had long ended, the obligated parties had submitted their compliance reports, and industry and EPA had moved onto 2024.

Plaintiff posits that a retroactive waiver for 2023 nonetheless could have given its members compliance flexibility for 2023 and 2024. Pl.'s Opp'n at 3. But Plaintiff has not offered a shred of evidence that, as of the filing of this suit in August 2024, its members needed or would have used that flexibility for 2023. *See, e.g., Arizona v. EPA,* 77 F.4th 1126, 1131 (D.C. Cir. 2023) (recognizing, with respect to claims that standing is "self-evident," that "a different analysis governs rules that expand the regulated parties' lawful range of choice"); *Am. Petroleum Inst. v. U.S. Dep't of Interior*, 823 F. App'x 583, 586 (10th Cir. 2020) ("API lacks standing to challenge [Office of Natural Resources Revenue's] 2016 amendments to [Federal Oil and Gas Royalty Management Act] because it has not demonstrated a sufficiently imminent threat of injury.").

6

Plaintiff simply offers that refiners, in practice, often wait after the compliance year to determine their obligations. Pl.'s Opp'n at 4-5. But, if that were the case, Plaintiff's members would have only three months after the end of the year to square away their requirements and submit a report to EPA. 40 C.F.R. § 80.1451(f)(1)(i)(A)(*1*). Refiners are well aware of the amount of petroleum gasoline and diesel fuel they produce each month, and regularly purchase RINs throughout the compliance year, rather than waiting for a mad scramble at the end to spend millions on RINs (and potentially face liability if they can't find enough). EPA data shows that obligated parties held D3 2023 RINs throughout 2023.[2] Plaintiff's general (unsupported) statements are not sufficient to establish standing here.

Moreover, to the extent that any individual refiner waited until August 2024 to comply, that "self-inflicted" wound is not sufficient to tie its harm to EPA's refusal here. *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989); *Huron v. Berry*, 12 F. Supp. 3d 46, 52 (D.D.C. 2013) ("Causation cannot exist when the injury alleged is self-inflicted."), *aff'd*, 809 F.3d 1274 (D.C. Cir. 2016). And even if Plaintiff's members had a harm as of August 2024, it is unclear how this Court could remedy that harm. Not only has the compliance deadline for 2023 long passed, but any 2023 RINs are now expired and can no longer be used for compliance going forward.[3]

---

[2] EPA, Available RINs – RIN Holdings Report, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/available-rins (last updated Dec. 10, 2025). Even though 2025 is not yet over, EPA data shows that refiners have already retired 2025 RINs for annual compliance. EPA, RIN Use - Total Retirements by Fuel (D Code) Report, Reason Code – Demonstrate Annual Compliance, Refiner, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rin-use (last updated Dec. 10, 2025).

[3] "[S]tanding is assessed by considering the facts at the time the complaint was filed," but it should be noted that the compliance deadline for 2024 occurred on December 1, 2025 and, thus, has also now passed. *Garnett v. Zeilinger*, 323 F. Supp. 3d 58, 64 (D.D.C. 2018); Pl.'s Opp'n at 21 n.3. This case now raises questions of mootness. *Garnett*, 323 F. Supp. 3d at 64. ("Just as Article III requires that plaintiffs have standing when they initiate a lawsuit, they must retain a justiciable controversy throughout the litigation."). Plaintiff appears to contend that some relief could still be available if provided by March 31, 2026, which Plaintiff claims is the compliance deadline for *2025*. Pl.'s Opp'n at 21. But any RINs retired to meet the 2023 volume requirements would be expired, any 2023 deficit was required to be met by December 1, 2025 (the compliance deadline for 2024), and waiver credits for 2023 are only valid for 2023

Plaintiff also fails to explain how the retroactive reduction could have benefitted its members for 2024. Plaintiff claims that 20 obligated parties carried a deficit over from 2023 to 2024. Pl.'s Opp'n at 6. But it does not claim that any of those 20 parties are among Plaintiff's members. Even if they were, in August and November of this year, EPA exempted numerous small refineries from the volume requirements;[4] if those are the same refineries that carried over a deficit, then the retroactive waiver would have no impact on them at all.

Plaintiff reverts to complaining that, had EPA met its deadlines, its members would not have suffered any harms. Pl.'s Opp'n at 4-5. But even if EPA had satisfied the statutory timeline, Plaintiff and its members would still be in the exact same spot as they are now. Before the deadline, EPA could have only prospectively reduced the cellulosic volume, and based on only projected volumes as of November 30, 2022, not the actual volume as calculated in hindsight in December 2023. As this argument makes clear, Plaintiff's real complaint is with the volumes that EPA originally set, not with its later refusal to reduce those volumes.

Finally, it makes no difference that EPA is not challenging Plaintiff's standing. Pl.'s Opp'n at 2. Even if "no party raise[s] standing," the Court has "an independent obligation to assure that standing exists." *Hudson v. Haaland*, 843 F. App'x 336, 337 (D.C. Cir. 2021) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). And EPA is incorrect not to challenge standing; it has confused the theoretical availability of a remedy—setting a new deadline for the waiver— with the required showing that the purported harms are caused by the challenged conduct and can be redressed by changing that challenged conduct.

---

and cannot be used to meet deficits. 40 C.F.R. §§ 80.1428(c), 80.1407(a)(1), 80.1456(b)(4); *see, e.g.,* Notice of August 2025 Decisions on Petitions for Small Refinery Exemptions, 90 Fed. Reg. 41829, 41830 (Aug. 27, 2025) (finding EPA was limited to only returning retired RINs, even if expired, in response to small refinery exemptions granted after compliance deadline).

[4] *See, supra* n.3 and *infra* n.10; Notice of November 2025 Decisions on Petitions for Small Refinery Exemptions, 90 Fed. Reg. 52385 (Nov. 20, 2025).

In short, Plaintiff cannot identify a harm traceable to EPA's refusal to retroactively reduce the volumes, rather than its initial decision to set the volumes, and redressable by this Court by requiring EPA to retroactively make such a reduction. Because Plaintiff lacks standing to challenge EPA's refusal, the suit must be dismissed.

## II.    Plaintiff's Challenge Had to Be Brought in the D.C. Circuit, Not This Court.

Even if Plaintiff had standing to challenge EPA's refusal to retroactively reduce the 2023 volume requirements, this Court would still lack jurisdiction to hear this case. Intervenor Mem. at 16-18; Defs.' Reply at 10-12. EPA simultaneously set the volumes and percentage standards in 2023, and EPA used "its best projection of cellulosic biofuel production" at that time. Defs.' Reply at 1-2. It declined to use its cellulosic waiver authority at that time, and it declined to issue any credits. 88 Fed. Reg. at 44479. That setting of the volumes and percentage standards, and the corresponding refusal to issue the credits, was what caused the alleged harms of Plaintiff's members. *See supra* at 4-7; Intervenor Mem. at 13-14. The Clean Air Act vests exclusive jurisdiction over any challenge to that decision in the D.C. Circuit. 42 U.S.C. § 7607(b)(1). Plaintiff sued to challenge the volume requirements in the D.C. Circuit, but it did not raise its concerns about EPA's cellulosic waiver authority or cellulosic waiver credits. That was its time to do so. The citizen suit provision does not give Plaintiff another avenue to bring such a challenge simply by reframing EPA's later refusal to change its mind a "nondiscretionary" action.

Plaintiff insists it does, arguing that EPA has an ongoing obligation to reduce the volumes because it missed the statutory deadline. But Plaintiff is not challenging EPA's failure to meet the November 30, 2022 statutory deadline or any such ongoing obligation—again, it wants EPA to reduce the volumes based on after-the-fact numbers for 2023, not projected numbers. *See* Ex. to Compl. (Dkt. No. 1-1) (making no reference to EPA missing this deadline in its notice of intent to sue). Indeed, Plaintiff's request to consider actual use, rather than projected production, is only

possible because EPA missed that deadline. So, Plaintiff can find no help in the cases it cites that used the citizen suit provision to challenge an agency's failure to meet a statutory deadline. *See Sierra Club v. McCarthy*, 61 F. Supp. 3d 35 (D.D.C. 2014); *Clean Fuels All. Am. v. Zeldin*, Civil Action No. 1:24-cv-03572 (D.D.C. filed Dec. 20, 2024); *Growth Energy v. EPA*, Civil Action No. 1:22-cv-01191 (D.D.C. Apr. 29, 2022); *cf. Sierra Club v. Wheeler*, 956 F.3d 612 (D.C. Cir. 2020) (finding statute provided no date certain and, thus, there was no nondiscretionary duty, affirming dismissal of claim under citizen suit based on lack of subject matter jurisdiction).

Plaintiff asserts that because the statute requires a "one-time" determination that the volumes should be reduced, and EPA failed to do so by the deadline, that this duty carries on indefinitely. Pl.'s Opp'n at 11. But again, Plaintiff is challenging "the *substance* of agency action *already taken*"—i.e., whether EPA improperly set the volume requirements and should have used its cellulosic waiver authority when setting the percentage standards for 2023. Pl.'s Opp'n at 7 (quoting *Sierra Club v. McCarthy*, 61 F. Supp. 3d at 39). EPA set the volumes at appropriate levels and, in setting the percentage standards to implement those volumes, declined to exercise the cellulosic waiver authority; that decision does not mean that EPA had an unfulfilled duty to later reconsider those volumes down the road. *See infra* at 14-20. The determination whether to waive the applicable *volumes* was to occur when EPA sets the percentage *standards*. Intervenor Mem. at 7, 19-20. That is, contrary to Plaintiff's assertion, "the cellulosic waiver *is* ... tied to the promulgation of annual RFS standards." Pl.'s Opp'n at 8 (emphasis added).

Moreover, both Plaintiff and EPA agree that EPA projected cellulosic biofuel production for 2023, as was required. Intervenor Mem. at 10, 24; Defs.' Reply at 1. Because projected production did not exceed the required volume, EPA had no duty to use the cellulosic waiver authority to set the volume at some other projected volume available or issue waiver credits. But

the key is that any duty to decide whether its cellulosic biofuel waiver authority was triggered occurred and EPA, thus, discharged its duty under the cellulosic biofuel waiver provision, 42 U.S.C. § 7545(o)(7)(D), albeit late for 2023. Plaintiff simply does not like the result. At bottom, Plaintiff's complaint is that the projected production did not trigger the cellulosic waiver to require waiver credits. That was a complaint that should have been filed within 60 days of EPA's final rule. Plaintiff cannot now characterize the waiver authority as a "nondiscretionary duty" to avoid the judicial review limitations in the statute.

To try to avoid this jurisdictional bar, Plaintiff claims it could not have raised this objection in its initial challenge in the D.C. Circuit because EPA asserted that it could not set the volume requirements and use the waiver authority at the same time. Pl.'s Opp'n at 4, 8 (citing Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes, 87 Fed. Reg. 80582, 80590 (proposed Dec. 30, 2022)). But Plaintiff distorts EPA's position. It is true that the setting of the applicable *volumes*, here, occurred under EPA's set authority in 42 U.S.C. § 7545(o)(2)(B)(ii), and, in setting the *volumes*, EPA is to make an "assumption" under 42 U.S.C. § 7545(o)(2)(B)(iv) that it will not need to issue a waiver. But none of the cited provisions, which relate to how EPA is to set the 2023 applicable *volume*, precluded EPA from using the cellulosic waiver authority when it set the 2023 *percentage standard*.

Plaintiff attempts to rewrite the statute by conflating the setting of the volumes with the setting of the standards. Pl.'s Opp'n at 8; *see Ctr. for Biological Diversity*, 141 F.4th at 165 ("EPA must meet two different statutory deadlines when promulgating volume requirements and percentage standards.") (quoting *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 716 (D.C. Cir.

2017)).[5] It is the volumes that are waived, not the percentage standards, and the statute expects the setting of the standards and the determination of whether to use the cellulosic waiver authority to occur at the same time.[6] And that is what happened here, when EPA set the percentage standards in July 2023 and declined to exercise its cellulosic waiver authority, as projected production was not less than the applicable volume EPA set. 87 Fed. Reg. at 80590; 88 Fed. Reg. at 44479. To the extent Plaintiff disagreed with EPA's determination, Plaintiff could have and should have challenged that at that time. Having made the choice not to, it cannot now restyle its objection to try to bring it in this Court. *See, e.g., Am. Wood Preservers Inst. v. EPA*, Civil Action No. 88-770 (RCL), 1989 U.S. Dist. LEXIS 6933, at *8 (D.D.C. June 21, 1989) (holding, due to potential to circumvent judicial review limits similar to those in Clean Air Act, "where jurisdiction exists under Section 7006 of RCRA, it divests the district court of any possible jurisdiction under § 7002"— RCRA's citizen suit provision).

Plaintiff also suggests that it could not have raised its objection earlier because EPA's interpretation of the statute was not "final agency action." Pl.'s Opp'n at 8-9. But in the *final* rule setting the 2023 volumes and percentage standards, EPA clearly outlined its authority under the set provisions and how that interacts with the cellulosic waiver authority, including the impact of its late determination for 2023.[7] 88 Fed. Reg. at 44477-44479. This determination by EPA had

---

[5] Plaintiff makes this error throughout its opposition. *See also* Pl.'s Opp'n at 11 ("EPA must set standards '*based on the assumption* that the Administrator will not need to issue a waiver[.]"), at 12 ("The statute first requires EPA to promulgate cellulosic biofuel standards 14 months before the year in which they take effect.").

[6] This is further evidenced by the fact that the projections of production for the cellulosic waiver must be "based on the estimate provided under paragraph (3)(A)," which were to be provided by the U.S. Energy Information Administration ("EIA"). 42 U.S.C. §§ 7545(o)(7)(D)(i), (3)(A). This is the same estimate used to set the percentage standards under 42 U.S.C. § 7545(o)(3)(B). While Plaintiff references a prior case that found EPA need not "slavish[ly]" adhere to the EIA estimates, Pl.'s Opp'n at 14 (quoting *Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 478 (D.C. Cir. 2013)), this does not mean that EPA can use whatever projection it wants or that such "projection" can be based on *actual* RIN generation.

[7] While raising challenges related to EPA's being late in issuing the volumes, Plaintiff declined to raise concerns with the impacts of the late issuance of the cellulosic waiver. *Ctr. for Biological Diversity*, 141 F.4th at 183-84.

legal consequences, as this required obligated parties to comply with the *projected available volumes* (which is the volume that EPA is required to use when using the cellulosic waiver authority) without the assurance of having cellulosic waiver credits available—the very source of Plaintiff's complaint here. That is a final agency action. *See Growth Energy v. EPA*, 5 F.4th 1, 12-13 (D.C. Cir. 2021) (finding lack of jurisdiction where EPA's policy being challenged was stated in prior rulemakings); *Med. Waste Inst. v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011) (finding lack of jurisdiction where EPA used same approach being challenged in prior rulemaking).

Plaintiff further claims that it did not know at that point that EPA would never be issuing a cellulosic waiver for 2023, as EPA retained authority to do so later on. Pl.'s Opp'n at 9. But nowhere in the 2023 proposal or final rule did EPA indicate that, if actual RIN generation was short, EPA thought it could use the cellulosic waiver authority retroactively. In the first excerpt that Plaintiff quotes, EPA is interpreting its authority and obligations for setting the cellulosic volume requirements under 42 U.S.C. §7545(o)(2)(B)(iv), not its cellulosic waiver authority more generally. 88 Fed. Reg. at 44477, *quoted in* Pl.'s Opp'n at 9. In the second excerpt, EPA is offering its general interpretation that it cannot issue cellulosic waiver credits unless there is an actual waiver. 88 Fed. Reg. at 44479, *quoted in* Pl.'s Opp'n at 9. For the last excerpt, Plaintiff simply cherry picks language that makes clear EPA was talking about its waiver authority more broadly:

> The volume targets that we are establishing in this action have similar status as those in the statute for the years shown in Table I–1. Specifically, they are the basis for the calculation of percentage standards applicable to producers and importers of gasoline and diesel unless they are waived in a future action using one or more of the available waiver authorities in CAA section 211(o)(7).

88 Fed. Reg. at 44470. Even if EPA could have still used some waiver authority to revise the volumes (which it did not), this does not render the determination non-final. "*[A]ny* agency action is *always* subject to displacement by a future rulemaking. If the mere possibility of displacement

13

rendered a governing agency rule non-final for purposes of judicial review, no rule would ever count as final." *NRDC v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020).

As if all of this were not enough, Plaintiff ignores that it already has an appeal to the D.C. Circuit raising this exact same issue. Plaintiff petitioned EPA to exercise its cellulosic waiver authority in 2023, EPA declined, and Plaintiff challenged that decision in the D.C. Circuit a few months before filing this suit. That appeal is now being held in abeyance pending resolution of this case. Again, all roads point to the D.C. Circuit, not this Court.

**III.    EPA Does Not Have the Authority to Retroactively Exercise the Cellulosic Waiver, Much Less a Nondiscretionary Duty to Do So.**

Even if this suit were properly before this Court, Plaintiff's challenge still fails on the merits, as EPA lacked any authority to retroactively exercise the cellulosic waiver, much less a nondiscretionary duty to do so. Intervenor Mem. at 18-35; Defs.' Reply at 5. As the program is set up, EPA is supposed to set the minimum volumes at least 14 months prior to the start of the compliance year and then set percentage standards for the refiners one month before, by November 30. At the same time, if the projected production of cellulosic biofuel is less than that previously calculated in setting the minimum volumes, EPA is to exercise its cellulosic waiver authority to reduce the required volume to the projected volume available. Nothing about that authorizes EPA to later reduce those volumes after the compliance year if actual RIN generation falls short. Plaintiff attempts to ignore or minimize these distinctions, but the terms Congress used have meaning and the statute must be construed consistent with the statutory structure and design.

Plaintiff contends that *because* EPA missed the November 30, 2022 deadline for issuing the waiver, EPA is somehow required to use the cellulosic waiver authority *anytime* the "conditions precedent" are met, because it "shall" exercise the waiver. Pl.'s Opp'n at 11-12. But that is not a date certain written anywhere in the statute for purposes of a deadline suit. Even EPA

attempts to claim that the November 30, 2022 deadline did not apply because EPA missed the deadline for issuing the 2023 *volumes.* Neither argument is consistent with the statute. Instead, for purposes of determining if a cellulosic waiver is required, the statute required EPA to project production of cellulosic biofuel (i.e., the trigger) to determine if it was required to reduce the applicable volume to the "projected volume available" (i.e., the waiver). 42 U.S.C. § 7545(o)(7)(D)(i). One cannot merely skip over the trigger and go straight to the waiver. Consistent with the statute and with past precedent, EPA did project production of cellulosic biofuel for 2023 *when it set the percentage standards. Id.* §§ 7545(o)(7)(D)(i), (3)(B); 88 Fed. Reg. at 44481-44484; Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 75 Fed. Reg. 14670, 14675 (Mar. 26, 2010). Neither Plaintiff nor EPA dispute this fact. Even though EPA did not use its cellulosic waiver authority when it set the 2023 standard, its projected production in the 2023 final rule was the only "one-time determination" required by statute. In other words, EPA's duty was "discharged" at that point. Pl.'s Opp'n at 1. That EPA chose to set the standards and the volumes at the same time (whether untimely or not) did not create a new (or even unfulfilled) nondiscretionary duty because EPA did not use the cellulosic waiver authority in the first instance.

Plaintiff's contention that EPA has a nondiscretionary duty to retroactively reduce the volume requirement to the actual volume used is even less persuasive. A prospective waiver does not become retrospective because EPA missed the statutory deadline. These provisions are designed to ensure that the parties are going into the compliance year knowing their obligations based on current projections—not to allow parties to escape their obligations after the fact. Only in this way would the parties understand the requirements for the coming year, so that cellulosic biofuel producers could take appropriate action to meet those volumes and obligated parties could

take appropriate action to obtain sufficient RINs to meet their volume obligations. Even where EPA sets the volumes at the same time as the standards (as it chose to do for 2023), if EPA sets the volumes and percentage standards immediately prior to—or even during—the compliance year, there is no need for a waiver, as the standards are being set based on the most up-to-date projections. Nothing in the statute suggests that Plaintiff can later complain that EPA's projections were incorrect and reset the timing for making a determination as to whether the cellulosic waiver authority is triggered. If that were true, there would be a moving target, eliminating the certainty that is needed to make the investments Congress sought and creating volatility in the market.

Plaintiff posits that, despite the plain text and operation of the statute, the cellulosic waiver authority must be retroactive because EPA has previously exercised this authority "even when it missed RFS deadlines." Pl.'s Opp'n at 18 (citing Renewable Fuel Standard (RFS) Program: Partial Waiver of the 2024 Cellulosic Biofuel Volume Requirement, 90 Fed. Reg. 29751, 29754 n.17 (July 7, 2025)); *see also* Pl.'s Opp'n at 17. But in all of those examples, the statute had set the minimum volumes many years before. In any case, none serve as precedent here. The direct final rule reducing the 2013 cellulosic biofuel volume was done on reconsideration, and EPA stated that the factual issues there would not necessarily be grounds for reconsideration later. Intervenor Mem. at 33 n.7 (citing Regulation of Fuels and Fuel Additives: 2013 Cellulosic Biofuel Standard, 79 Fed. Reg. 25025 (May 2, 2014)). With respect to the 2020 volume requirement, EPA again used its reconsideration authority to reduce the volumes *for all categories* as a result of "several unanticipated and exceptional events" (e.g., the COVID pandemic) that occurred since promulgation and noted that reconsideration generally should not occur as it "can impose costs on regulatory certainty and unduly disrupt market expectations created by previously promulgated standards." 87 Fed. Reg. at 39602, 39609-39610. For the other years, EPA was late in setting the

16

standards to implement the statutory volume requirements and, thus, used the cellulosic waiver authority at the same time it set those standards (which it could have done for 2023, but chose not to do so). *See* Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77420, 77430 (Dec. 14, 2015) (for 2014 and 2015); 87 Fed. Reg. at 39609 (for 2021 and 2022). These actions do not support the assertion of cellulosic waiver authority after the percentage standards have been set, much less after the compliance deadline has passed.[8]

Instead, EPA has routinely taken the position that the statute does not suggest "that EPA must retroactively adjust the volumes based on actual use of renewable fuel during the calendar year." EPA, *Renewable Fuel Standard (RFS) Program: Standards for 2023–2025 and Other Changes - Response to Comments,* at 16 (2023), https://www.regulations.gov/document/EPA-HQ-OAR-2021-0427-1114. While EPA was discussing its duty to "ensure" the volumes, similarly, nothing in the cellulosic waiver provision suggests "that EPA must retroactively adjust the volumes based on actual use of renewable fuel during the calendar year." *See* Defs.' Reply at 1 ("What the statute does *not* do—contrary to Plaintiff's demand in this action—is require EPA to determine retrospectively whether the volume of cellulosic biofuel actually produced matched EPA's projection.").

The plain text of the statute confirms that the required one-time determination is a prospective inquiry, permitting the cellulosic waiver authority to be used only where the "*projected* volume of cellulosic biofuel *production*" is lower than the applicable volume set. 42 U.S.C. § 7545(o)(7)(D)(i) (emphases added). Ignoring the text of the statute, Plaintiff suggests that the

---

[8] It is telling that EPA does not reference 2022 in the cited footnote, 90 Fed. Reg. at 27954 n.17, which was also issued late. This may be because EPA used both the reset authority under 42 U.S.C. § 7545(o)(7)(F) and the cellulosic waiver authority at the same time to set the cellulosic biofuel volume, despite the reset authority being subject to the same provisions as the set authority used to set the 2023 requirement. 87 Fed. Reg. at 39602, 39623.

cellulosic waiver is triggered when the actual volumes available for use reflected in D3 RIN generation are lower than the projected volume produced. But the statute's distinction between projected production and actual use is key. Pl.'s Opp'n at 19-20. In establishing the program, Congress was trying to force the market to act by setting the demand that must be met (i.e., the volume requirements). The statute ties the trigger for the waiver to projected production, rather than actual use, not only to promote production but also to require parties downstream (e.g., obligated parties) to take action to incorporate those fuels into the transportation fuel market. Allowing EPA to reduce the volumes retroactively for 2023 allows the obligated parties to do nothing to meet the cellulosic biofuel volume requirements. That clearly was not the purpose of the cellulosic waiver provision.

Moreover, Plaintiff itself acknowledges that RIN generation does not equate to production and does not dispute that RIN generation for renewable natural gas reflected *use* (i.e., dispensing into vehicles) not *production*. Intervenor Mem. at 5. The attempt to conflate the two by claiming that the relevant volume for production is only the renewable natural gas that can be used as transportation fuel is the same argument rejected by the D.C. Circuit in *Americans for Clean Energy v. EPA*, 864 F.3d at 710-711.[9] Even *Sinclair Wyoming Refining Co. v. EPA*, 101 F.4th 871, 885 (D.C. Cir. 2024), recognized the difference between the broader requirement to project total production from the narrower projection of volumes available for use. *Cf.* Pl.'s Opp'n at 20.

---

[9] Plaintiff quotes *Americans for Clean Energy v. EPA*, 864 F.3d at 712, to contend "the D.C. Circuit in that case noted that 'the fact that EPA thinks a statute would work better if tweaked does not give EPA the right to amend the statute.'" Pl.'s Opp'n at 19. But it is Plaintiff that is attempting to write whole phrases out of the statute and pretend that the rest of the statute is immaterial. Moreover, in that case, Congress was admonishing the agency for conflating supply (e.g., production) with demand (e.g., use) that was inconsistent with the text and the market-forcing policy of the program, *Ams. for Clean Energy*, 864 F.3d at 710-712, which is precisely what Plaintiff is trying to do in claiming actual RIN generation can be used to project *production* despite that RIN generation for renewable natural gas reflected use and Plaintiff's acknowledgement that RIN generation does not equate to production. Intervenor Mem. at 23-26.

Other provisions in the statute similarly illustrate Plaintiff's misreading of the cellulosic waiver provision here. Unlike the case in *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 166-167 (2003), it is clear here that Congress wanted finality in setting the deadlines. Elsewhere in the statute, Congress used terms such as "any time," rather than, as it did here, provide a specific date prior to the compliance year. Intervenor Mem. at 19-21. While Plaintiff also attempts to claim that the general waiver authority "does not displace or supersede the other," Pl.'s Opp'n at 19, that misses the point. Congress provided a separate waiver for instances where, as Plaintiff claims is the case here, there is insufficient supply of biofuel to meet the volume requirements. 42 U.S.C. § 7545(o)(7)(A)(ii). That Congress made it discretionary, which Plaintiff may not like, indicates that Congress *did not* intend to *require* a reduction in the cellulosic biofuel requirement on those same grounds. Pl.'s Opp'n at 19; Intervenor Mem. at 26-27. In other words, it makes little sense that, for the one category that Congress wanted to grow ambitiously it would *require* reductions based on *any* shortfall in RIN generation, which would essentially be the result of Plaintiff's reading of the statute. This is particularly true when, in fact, there were sufficient RINs to meet compliance for 2023, and EPA determined a waiver based on inadequate domestic supply was not warranted.[10] Intervenor Mem. at 33-34.

After all, the Renewable Fuel Standard is a market-forcing policy. Intervenor Mem. at 1, 22, 28, 35. Plaintiff urges this Court to ignore the program's purpose and structure, Pl.'s Opp'n at 18-19, but these are "[t]raditional tools of statutory construction." Pl.'s Summ. J. Mem. at 17 (Dkt. No. 16-1) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024)). The D.C.

---

[10] This is even more the case now after EPA has granted small refinery exemptions, which would reduce the RINs required by almost 37 million. This is based on EPA's estimated exempted volumes of gasoline and diesel found at EPA, RFS Small Refinery Exemptions, Table SRE-1, https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions (last updated Dec. 18, 2025), multiplied by the current standard for 2023 found at 40 C.F.R. § 80.1405(a) (0.48%).

Circuit has rightly considered statutory structure, purpose, and context in assessing whether EPA retains authority to *implement volume requirements* after the statutory deadline. *See, e.g., Ams. for Clean Energy*, 864 F.3d at 721 ("Specifically, the Court pointed to: … EPA's 'statutory mandate' to 'ensure' that the annual volume requirements are met; and … the notion that it would be 'drastic' and 'incongruous' to preclude EPA from fulfilling that 'statutory mandate' based on its delay.") (citing *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 154-58 (D.C. Cir. 2010) and *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 920 (D.C. Cir. 2014)). The same type of concerns points in the opposite direction here. Congress carefully limited the ability of EPA to reduce the volumes after the standards have been set because, as EPA has recognized, retroactive waivers have negative impacts on investments in renewable fuels, which undermines the entire purpose of the Renewable Fuel Standard. Intervenor Mem. at 34-35.

Plaintiff ends by pointing to EPA's recent decision to use the cellulosic biofuel waiver authority to reduce the 2024 cellulosic biofuel volume after the fact, a reduction that occurred *after* this case was filed. Pl.'s Opp'n at 16-18. Intervenor has challenged this 2024 waiver in the D.C. Circuit—the proper forum—and this Court should let the legality of that waiver be resolved in that court. The 2024 waiver has no bearing on the present case.

## IV.    The Only Possible Remedy Is Requiring EPA to Confirm the Projected Volume of Cellulosic Biofuel.

Finally, even if it could be determined that EPA does still have a nondiscretionary duty, that duty is limited to confirming that there is no need for a waiver here. The waiver is prospective and must be assessed based on "projected" production. The relevant date for the projection is November 30, 2022—or at the very latest, July 12, 2023, the day EPA set the percentage standards. That projected production of cellulosic biofuels was 840 million gallons, which is what the volumes were set at. So based on Plaintiff's own admissions and theories, had EPA merely issued

a determination on July 13, 2023 (the day after it published the 2023 volume requirements) that the cellulosic waiver was not triggered, then Plaintiff has no case.

Plaintiff asks for a far more remarkable remedy, requiring EPA to base its waiver on the actual number of RINs generated—that is, the amount of cellulosic biofuel that was actually *used* as transportation fuel, as reflected in RIN generation in 2023. Pl.'s Opp'n at 24. But again, the waiver must be based on "projected volume of … production," not the actual volume consumed. 42 U.S.C. § 7545(o)(7)(D)(i); *see* Intervenor Mem. at 23-26. As the D.C. Circuit concluded, EPA appropriately projected production of cellulosic biofuel—the majority of which was renewable natural gas—that could be used as transportation fuel. Looking at actual use allows obligated parties to do nothing, despite having more than ample biofuel available, and then seek to be rewarded for their recalcitrance—as Plaintiff seeks to do in this action.

## CONCLUSION

For the foregoing reasons and for the reasons in Intervenor Coalition for Renewable Natural Gas' Memorandum in Opposition to Plaintiff AFPM's Motion for Summary Judgment and in Support of Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment in Favor of Defendants, the Complaint must be dismissed and Plaintiff's request for summary judgment must be denied.

Dated: December 22, 2025            Respectfully submitted,

/s/ Sandra P. Franco
Sandra P. Franco
DC Bar Number: 467091
Franco Environmental Law, LLC
600 Pennsylvania Avenue, SE
Unit 15577
Washington, DC 20003
T 202 256-6115
sandra@francoenvironmentallaw.com

Jonathan Y. Ellis
Grace Greene Simmons
McGuire Woods LLP
888 16th St. N.W.
Suite 500
Washington, D.C. 20006
T 202 828-2887
*jellis@mcguirewoods.com*
*gsimmons@mcguirewoods.com*

*Counsel for Coalition for Renewable Natural Gas*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS,

              *Plaintiff,*

    v.

LEE ZELDIN, in his official capacity as
Administrator of the U.S. Environmental Protection
Agency, and U.S. ENVIRONMENTAL
PROTECTION AGENCY,

              *Defendants*,

COALITION FOR RENEWABLE NATURAL
GAS,

              *Defendant-Intervenor.*

Case No.
1:24-cv-02361 (RBW)

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of December, 2025, I caused the Reply in Support of the Cross-Motion of Coalition for Renewable Natural Gas to Dismiss or, in the Alternative, for Summary Judgment to be electronically filed using the Court's CM/ECF system and that service will be accomplished by the CM/ECF system.

                                   /s/ Sandra P. Franco
                                   Sandra P. Franco