**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS,

Plaintiff,

v.

LEE M. ZELDIN,[1] in his official capacity as Administrator of the United States Environmental Protection Agency, et al.,

Defendants,

COALITION FOR RENEWABLE NATURAL GAS,

Defendant-Intervenor.

Civil Action No. 24-2361 (RBW)

# MEMORANDUM OPINION

The plaintiff, the American Fuel & Petrochemical Manufacturers ("AFPM"), brings this action against the defendants, the United States Environmental Protection Agency and Lee Zeldin, in his official capacity as Administrator of the United States Environmental Protection Agency (collectively "the EPA" or the "EPA Defendants"), pursuant to 42 U.S.C. § 7604, alleging that the EPA failed "to partially waive Renewable Fuel Standard ('RFS') program requirements for cellulosic biofuel for 2023, and to make cellulosic biofuel credits available for that year, as required by Clean Air Act ('CAA') Section 211(o), 42 U.S.C. § 7545(o)."

[1] Pursuant to Federal Rule Civil Procedure 25(d), Lee Zeldin, in his official capacity, is automatically substituted for former United States Environmental Protection Agency ("EPA") Administrator Michael S. Regan, as a defendant in this case.

Complaint For Declaratory And Injunctive Relief ("Compl.") at 1, ECF No. 1. According to the plaintiff, "[the] EPA has a nondiscretionary duty to take those actions when projected annual cellulosic biofuel volumes exceed the actual volumes produced for that year." Id. The Coalition for Renewable Natural Gas (the "defendant-intervenor" or the "Coalition") has intervened as a defendant pursuant to Federal Rule of Civil Procedure 24(b). See Order (Feb. 19, 2025) at 8, ECF No. 12 (granting the Coalition's motion to intervene).

Currently pending before the Court are the Plaintiff's Motion for Summary Judgment, ECF No. 16 ("Pl.'s Mot."), the Defendants' Cross-Motion to Dismiss Or, In The Alternative, For Summary Judgment on Remedy, ECF No. 18 ("EPA's Mot."), and the Cross-Motion Of Defendant-Intervenor Coalition For Renewable Natural Gas To Dismiss For Lack of Jurisdiction Or, In The Alternative, For Summary Judgment, ECF No. 23 ("Coalition's Mot."). Upon careful consideration of the parties' submissions[2] and the applicable legal authority, the Court concludes

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."), ECF No. 16-1; (2) the Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Facts"), ECF No. 16-2; (3) the Declaration of Susan W. Grissom ("Grissom Decl."), ECF No. 16-3; (4) Grissom Decl., Exhibit ("Ex.") 2 ("Petition for Partial Waiver of 2023 Cellulosic Biofuel Volumetric Requirements") at 1–2, ECF No. 16-3; (5) Grissom Decl., Ex. 3 ("AFPM's Petition for Partial Waiver of the 2023 Cellulosic Biofuel Volumetric Requirements – Update") at 1, ECF No. 16-3; (6) Grissom Decl., Ex. 4 ("Denial of AFPM Petition for Partial Waiver of 2023 Cellulosic Biofuel Standard") at 1, ECF No. 16-3; (7) the Defendants' Memorandum of Points and Authorities in Support of Its Cross-Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, for Summary Judgment on Remedy and Response to Plaintiff's Motion for Summary Judgment ("EPA's Mem."), ECF No. 18-1; (8) the Defendants' Response to Plaintiff's Statement of Undisputed Material Facts and Defendants' Statement of Material Facts in Support of Their Own Cross-Motion for Summary Judgment ("EPA's Resp. to Pl.'s Facts"), ECF No. 18-2; (9) EPA's Resp. to Pl.'s Facts, Ex. 1 ("Final Opening Brief of American Fuel & Petrochemical Manufactures; REH Company; The Small Refineries Coalition; Countrymark Refining and Logistics, LLC; The San Antonio Refinery LLC; and Wynnewood Refining Co., LLC"), ECF No. 18-3; (10) the Defendants' Memorandum of Points and Authorities in Support of Its Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment on Remedy and Response to Plaintiff's Motion for Summary Judgment ("EPA's Opp'n"), ECF No. 19; (11) the Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant-Intervenor's Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment ("Coalition's Mem."), ECF No. 23-1; (12) the Defendant-Intervenor's Response to Plaintiff's and Defendants' Statements of Undisputed Material Facts and Defendant-Intervenor's Statement of Additional Undisputed Material Facts ("Coalition's Resp. to Pl.'s Facts"), ECF No. 23-2; (13) the Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant-Intervenor's Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment ("Coalition's Opp'n"), ECF No. 24; (14) the Plaintiff's Combined Response to Defendants' and Defendant-Intervenor's Cross-

(continued . . .)

that the plaintiff's motion must be denied because the plaintiff has failed to demonstrate Article III associational standing, and even if the Court could find that the plaintiff has standing, its claims are precluded from proceeding pursuant to the citizen suits provision of the CAA, 42 U.S.C. § 7604(a)(2). The Court's analysis, detailed below, is guided by the District of Columbia Circuit's decision in Center for Biological Diversity v. United States Environmental Protection Agency, 141 F.4th 153 (D.C. Cir. 2025) ("CBD"), which considered the EPA's RFS program standards for 2023. Accordingly, for the reasons set forth below, the Court grants in part the Coalition's cross-motion to dismiss, grants in part the EPA's cross-motion to dismiss, and denies the plaintiff's motion for summary judgment.

## I. BACKGROUND

### A. Statutory Framework

The Renewable Fuel Standard program under the Clean Air Act requires that a certain volume of renewable fuel be used to replace or reduce the quantity of fossil fuel in commerce. See Energy Independence and Security Act of 2007, Pub. L. No. 110–140, § 202, 121 Stat. 1492, 1521–24 (codified at 42 U.S.C. § 7545(o)). This goal is accomplished by "requir[ing] [that] an increasing amount of renewable fuel [ ] be introduced into the Nation's transportation fuel supply each year . . . and tasks the EPA Administrator with 'ensuring that those targets are met.'" Ctr. for Biological Diversity v. U.S. Env't Prot. Agency, 141 F.4th 153, 163 (D.C. Cir. 2025) (quoting Ams. For Clean Energy v. Env't Prot. Agency, 864 F.3d 691, 696 (D.C. Cir.

---

(. . . continued)
Motions to Dismiss, or in the Alternative, for Summary Judgment ("Pl.'s Opp'n"), ECF No. 25; (15) the Plaintiff's Combined Response to Defendants' and Defendant-Intervenor's Cross-Motions to Dismiss, or in the Alternative, for Summary Judgment and Reply in Support of Its Motion for Summary Judgment ("Pl.'s Reply"), ECF No. 26; (16) the Defendants' Reply Memorandum of Points and Authorities in Support of Its Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment on Remedy ("EPA's Reply"), ECF No. 29; (17) the Errata in Defendants' Reply in Support of Its Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment on Remedy, ECF No. 30; and (18) the Reply in Support of Cross-Motion of Coalition for Renewable Natural Gas to Dismiss or, in the Alternative, for Summary Judgment ("Coalition's Reply"), ECF No. 33.

2017) and Am. Fuel & Petrochemical Mfrs. v. Env't Prot. Agency, 937 F.3d 559, 568 (D.C. Cir. 2019)).

The CAA explicitly lists the applicable required gallons of four different types of renewable fuel through the years 2012 or 2022, depending on the type of fuel. See 42 U.S.C. § 7545(o)(2)(B)). The four categories of renewable fuel are: (1) advanced biofuel, (2) biomass-based diesel, (3) cellulosic biofuel, and (4) renewable fuel. See 42 U.S.C. §§ 7545(o)(1)(B), (D), (E), (J). This case concerns only one of those categories—cellulosic biofuel. See generally Compl. ¶¶ 22–28. Cellulosic biofuel "means renewable fuel derived from cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions . . . that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions." 42 U.S.C. § 7545(o)(1)(E). And, the CAA includes the applicable amount of cellulosic biofuel that should be introduced into commerce through the year 2022. 42 U.S.C. §§ 7545(o)(2)(B)(i)(III).

After 2022, however, the CAA tasks the EPA Administrator with the responsibility of determining the annual volume of cellulosic biofuel "in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the [RFS] program during calendar years [2010 through 2022], and an analysis of" specific factors set forth in the Act. 42 U.S.C. § 7545(o)(2)(B)(ii). The CAA provides that the Administrator "shall promulgate rules establishing [such] volumes . . . no later than 14 months before the first year for which such applicable volume will apply." Id. Thus, for 2023, the "EPA was required to promulgate [cellulosic biofuel] requirements by the end of October 2021." CBD, 141 F.4th at 183–84. And, for cellulosic biofuel specifically, the EPA Administrator is to set the applicable

annual volume "based on the assumption that the Administrator will not need to issue a waiver for" that specific year. Id. § 7545(o)(2)(B)(iv).

Subsequently, the EPA uses the annual volume requirements to set percentage standards that obligated parties[3] use to determine the amount of renewable fuel they "must introduce into U.S. commerce based on the volumes of fossil-based gasoline or diesel [the obligated party] imports or produces." CBD, 141 F.4th at 163 (citing Ams. for Clean Energy, 864 F.3d at 699); see 42 U.S.C. § 7545(o)(3)(B)(ii)(II).[4] The purpose of setting a percentage is that "if every obligated party incorporates the required percentage of renewable fuel into the gasoline and diesel it sells, the transportation fuel industry as a whole will achieve the established applicable volumes." Sinclair Wyo. Refin. Co. v. Env't Prot. Agency, 101 F.4th 871, 878 (D.C. Cir. 2024) (quoting Am. Fuel & Petrochemical Mfr., 937 F.3d at 587). Historically, "[t]he volumes [set] for

[3] The EPA defines an "obligated party" as "any refiner that produces gasoline or diesel fuel within the covered location, or any importer that imports gasoline or diesel fuel into the covered location, during a compliance period." 40 C.F.R. § 80.2. A refiner is defined as "any person who owns, leases, operates, controls, or supervises a refinery." Id.

[4] Although the District of Columbia Circuit did not address the statutory provisions which allegedly directs the EPA Administrator to express volumes of renewable fuel in percentages for obligated parties' use in its 2025 CBD opinion, and the parties do not raise an issue regarding these specific provisions in this case, these specific provisions provide that:

> [n]ot later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

42 U.S.C. § 7545(o)(2)(B)(i); see id. § 7545(o)(2)(B)(ii) (providing that "[t]he renewable fuel obligation determined for a calendar year under clause (i) shall– . . . (II) be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States. . . ."). Based on the plain text of this section of the statute, it appears that the statute does not explicitly address whether the EPA is also required to express volumes of renewable fuel in percentages for obligated parties' use after 2021, i.e., in 2023. It appears that the EPA has interpreted this silence in the statute to mean that it "can establish percentage standards for any number of years at the same time that it establishes the volume targets for those years[,]" see Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes, 87 Fed. Reg. 80582-1, 80584 (Dec. 30, 2022), and the Circuit did not explicitly disagree with the EPA's interpretation. See CBD, 141 F.4th at 163, 165; see also Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes, 88 Fed. Reg. 44468-01, 44470 (July 12, 2023). Therefore, because this Court is bound by the Circuit's precedent and reasoning, it adheres to the Circuit's interpretation of the CAA and therefore assumes that the volume of cellulosic biofuel was to be listed as a percentage for year 2023.

cellulosic biofuel . . . has not kept pace with the growth the [RFS] [p]rogram projected." Sinclair Wyo. Refin. Co., 101 F.4th at 878. Therefore, the CAA allows the EPA to make adjustments to the cellulosic biofuel volume under certain circumstances. See 42 U.S.C. § 7545(o)(7); see also Sinclair Wyo. Refin. Co., 101 F.4th at 878. Accordingly, if "the projected [annual] volume of cellulosic biofuel production is less than the minimum applicable volume" the EPA Administrator set, then "not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required . . . to the projected volume available during that calendar year." 42 U.S.C. § 7545(o)(7)(D)(i). This is referred to as the "cellulosic waiver provision."

Although refiners are typically obligated parties under the CAA, they "need not themselves produce or import renewable fuel." Sinclair Wyo. Refin. Co., 101 F.4th at 879. Instead, refiners "can acquire and trade credits," called Renewable Identification Numbers ("RINs"), to comply with their renewable fuel obligations. See id. RINs "are generated when renewable fuel is produced in or imported to the United States, and they are valid for twelve months from the date of generation." Id. (citing 42 U.S.C. § 7545(o)(5)). The EPA tracks the generation, transfer, and retirement of RINs through its Moderated Transaction System ("EMTS"), which serves as "a publicly-accessible database from which the quantity of available RINs in any given year can be determined." Compl. ¶ 21.

If an obligated party accumulates more RINs than they need for a particular year, the obligated party may sell them "or carry them over to be used to satisfy a portion of the following year's obligations." Sinclair Wyo. Refin. Co., 101 F.4th at 879 (citing 42 U.S.C. § 7545(o)(5)(C)). An obligated party may also use its cellulosic biofuel and biomass-based diesel RINs to satisfy either its cellulosic biofuel, biomass-based diesel, advanced biofuel, or

total renewable fuel obligations. 40 C.F.R § 80.1427. On the other hand, if an obligated party does not have enough RINs in a given year, they can purchase more or "carry forward a . . . deficit on [the] condition that the [obligated party], in the [following] year . . . —(i) achieves compliance with the renewable fuel requirement . . . ; and (ii) [accumulates] additional renewable fuel credits to offset the . . . deficit of the previous year." 42 U.S.C. § 7545(o)(5)(D). Additionally, if the "EPA invokes the cellulosic waiver provision, it must 'make available for sale cellulosic biofuel credits,' which obligated parties may use, alongside or instead of RINs, to meet their cellulosic biofuel obligations." Sinclair Wyo. Refin. Co., 101 F.4th at 879.

**B. Factual Background**

On December 30, 2022, pursuant to its authority to establish post-2022 renewable fuel volumes, the EPA "proposed an applicable volume for cellulosic biofuel of 720 million ethanol-equivalent gallons" for the 2023 compliance year. Pl.'s Facts ¶ 2; EPA's Resp. to Pl.'s Facts ¶ 2; Coalition's Resp. to Pl.'s Facts ¶ 2; Renewable Fuel Standard (RFS) Program: Standards for 2023-2025 and Other Changes, 87 Fed. Reg. 80582-1, 80584 (Dec. 30, 2022). Subsequently, the EPA issued a final rule on July 12, 2023, "establish[ing] an applicable volume for cellulosic biofuel of 840 million ethanol-equivalent gallons for the year 2023." Pl.'s Facts ¶ 3; EPA's Resp. to Pl.'s Facts ¶ 3; Coalition's Resp. to Pl.'s Facts ¶ 3; see also Renewable Fuel Standard Program: Standards for 2023–2025 and Other Changes, 88 Fed. Reg. 44468, 44470 (July 12, 2023). In issuing the final rule, the EPA neither invoked the cellulosic waiver provision, nor did it make cellulosic waiver credits available for the 2023 compliance year. Pl.'s Facts ¶¶ 4–5; EPA's Resp. to Pl.'s Facts ¶¶ 4–5; Coalition's Resp. to Pl.'s Facts ¶¶ 4–5.

On December 22, 2023, several months after the EPA issued its final rule, "[the p]laintiff petitioned [the EPA] to invoke the cellulosic biofuel waiver provision of the RFS, 42 U.S.C.

§ 7545(o)(7)(D), to reduce the applicable volume to the projected volume available and to issue cellulosic biofuel credits." Pl.'s Facts ¶ 6; EPA's Resp. to Pl.'s Facts ¶ 6; see Coalition's Resp. to Pl.'s Facts ¶ 6 (contending that the plaintiff "provided a letter to EPA . . . asking EPA to waive a portion of the 2023 cellulosic biofuel volume requirement[,]" but not admitting that the plaintiff filed a "petition"). In support of its request, the plaintiff argued that "[a]t [the] current rates of cellulosic biofuel production, . . . cellulosic production w[ould] fall short of the 2023 cellulosic mandate by approximately 81 million gallons[.]" Petition for Partial Waiver of 2023 Cellulosic Biofuel Volumetric Requirements at 1–2. The plaintiff also argued that there was a "depleted supply of cellulosic carryover RINs" that may result in "significant compliance and liquidity problems in the cellulosic RIN market from an undersupplied RIN bank." Id. at 2. Subsequently, on March 4, 2024, the plaintiff updated its request to the EPA by providing updated "biofuel production information for 2023." See AFPM's Petition for Partial Waiver of the 2023 Cellulosic Biofuel Volumetric Requirements – Update at 1.

On March 15, 2024, for several reasons, the EPA denied the plaintiff's petition because it "determined that a partial waiver of the 2023 cellulosic biofuel standard [wa]s not warranted." Denial of AFPM Petition for Partial Waiver of 2023 Cellulosic Biofuel Standard at 1; Notice of Denial of Petition for Partial Waiver of 2023 Cellulosic Biofuel Standard Under the Renewable Fuel Standard Program, 89 Fed. Reg. 20961-2, 20962 (Mar. 26, 2024). First, the EPA declined to consider the plaintiff's request to waive the cellulosic volume requirement pursuant to 42 U.S.C. § 7545(o)(7)(D)[5] because that subsection "does not specify that it authorizes petitions to

[5] 42 U.S.C. § 7545(o)(7)(D) states, in part:

(i) For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic

(continued . . .)

waive cellulosic biofuel volumes." Id. at 4. Second, the EPA explained that because § 7545(o)(7)(A) "authorizes waiver petitions based only on severe economic harm and inadequate domestic supply[,]" it would "would evaluate the AFPM Petition as having been submitted under CAA section [7545](o)(7)(A)." Id.[6]

The EPA further explained that the plaintiff's petition was denied because when considering the approximate amount of RINs that were generated at that time and the carryover RINs that were available from 2022, "the total number of RINs available to comply with the 2023 cellulosic biofuel standard [was] approximately 850 million RINs[,]" which was "approximately equivalent to [the EPA's] current estimate of the total volume necessary to comply with the 2023 cellulosic biofuel standard." Id. at 5. Additionally, the EPA continued, "[i]f the number of available cellulosic RINs ultimately falls short of the number of RINs needed for obligated parties to satisfy their" 2023 obligations, "the shortfall would [not] be of such a magnitude that obligated parties would be forced into non-compliance with their RFS

---

(. . . continued)

> biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.
>
> (ii) Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

[6] 42 U.S.C. § 7545(o)(7)(A) states, in part:

> The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)—
>
> (i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States[.]

obligations." Id. at 5–6. Instead, an obligated party could "carry forward a cellulosic RIN deficit . . . into 2024." Id. at 6. The EPA also disagreed with the plaintiff's claim that some obligated parties who carried a cellulosic RIN deficit into 2023 and therefore would be prohibited from carrying a deficit into 2024[,] "may choose to limit their production to the number of RINs they can acquire." Id. at 8. To the contrary, the EPA stated that "historical evidence" suggests that "[o]bligated parties have carried cellulosic RIN deficits every year since 2013, and [the EPA] ha[d] seen no evidence that these RIN deficits have caused obligated parties to limit their production." Id. Finally, the EPA concluded that "a partial waiver of the 2023 cellulosic biofuel standard would be injurious to the RFS program because it would be disruptive to program participants and could result in reduced future demand for cellulosic biofuel production." Id. at 10. Subsequently, on May 28, 2024, the plaintiff notified the EPA that because of its position, it intended to sue under the Clean Air Act's citizen-suit provision, 42 U.S.C. § 7604(a)(2). Pl.'s Facts ¶ 21; EPA's Resp. to Pl.'s Facts ¶ 21; Coalition's Resp. to Pl.'s Facts ¶ 21.

While the plaintiff was participating in the above described proceedings before the EPA, it also intervened in a case challenging the EPA's RFS Program standards for years 2023, 2024, and 2025 pending before the District of Columbia Circuit. See generally CBD, 141 F.4th at 153; see also, Am. Fuel & Petrochemical Mfrs.' Mot. To Intervene In Support Of Respondent (Oct. 10, 2023), CBD, 141 F.4th at 162, Dkt. 2021091; Order at 1 (Nov. 16, 2023), CBD, 141 F.4th at 162, Dkt. 2027447. In the case pending before the District of Columbia Circuit, the plaintiff, along with refinery companies and organizations, argued, inter alia, that the "2023 and 2024 volume requirements were impermissibly late[,]" i.e., the "EPA missed the statutory deadlines for promulgating" the 2023 and 2024 volume requirements. CBD, 141 F.4th at 183. The Circuit

disagreed with the plaintiff, finding that its "precedent foreclose[d]" the plaintiff's argument. Id. The Circuit explained that it has "repeatedly held that [the] EPA may promulgate late, and even retroactive, volume requirements so long as it 'reasonably considers and mitigates any hardship caused to obligated parties by reason of the lateness.'" Id. at 184 (quoting Sinclair Wyo. Refin. Co., 101 F.4th at 887). In regards to the volume requirements the EPA set in 2023, the Circuit found that the "EPA reasonably considered the requisite factors[,]" such as: (1) "explain[ing] that the market would produce enough renewable fuel to enable obligated parties to satisfy the requirements"; (2) "obligated parties would have at least nine months to bring themselves into compliance with the 2023 requirements"; and (3) "any remaining hardship would be minimal because, if an obligated party could not acquire sufficient RINs within [nine months], it could still achieve compliance by using carryover RINS or carrying forward RIN deficits." Id.

**C. Procedural History**

The plaintiff filed its Complaint on August 15, 2024, alleging that the EPA failed to perform nondiscretionary duties under the CAA by failing to reduce the 2023 cellulosic biofuel volume requirement and by failing to make cellulosic waiver credits available. Compl. ¶¶ 79, 86. Subsequently, the Court granted the Coalition's motion to intervene as a defendant. See Order (Feb. 19, 2025) at 1–2, ECF No. 12.

On May 5, 2025, the plaintiff filed its motion for summary judgment. See generally Pl.'s Mot. The EPA Defendants filed their cross-motion to dismiss for lack of jurisdiction or, in the alternative, for summary judgment on the remedy component of the plaintiff's case on August 4, 2025. See generally EPA's Mot. And, on August 19, 2025, the Coalition filed its cross motion to dismiss for lack of jurisdiction or, in the alternative, for summary judgment. See generally

Coalition's Mot. On December 22, 2025, the parties' briefing on their respective motions became ripe for the Court's resolution.

On April 23, 2026, the EPA moved to stay the proceedings in this case pending the District of Columbia Circuit's decision in Coalition for Renewable Natural Gas v. Environmental Protection Agency, 25-1183. See Motion to Abate Proceedings During Pendency D.C. Circuit Review of Related Cases and Statement of Points and Authorities ("Mot. to Stay"), ECF No. 35. The defendant-intervenor and the plaintiff opposed the motion, see Opposition of Coalition for Renewable Natural Gas to Defendants' Motion to Abate Proceedings During Pendency of D.C. Circuit Review of Related Case, ECF Nos. 36; Plaintiff's Opposition to EPA's Motion to Abate Proceedings, ECF No. 37, and the Court denied the EPA's motion, concluding that a stay was not warranted, see Order (May 27, 2026) at 4–5, ECF No. 41.

## II. STANDARDS OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(1)

Federal courts are courts of limited jurisdiction, and therefore "possess only that power authorized by Constitution and statute," Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), "which is not to be expanded by judicial decree," id. Moreover, "[it] is to be presumed that a cause lies outside this limited jurisdiction," and "the burden of establishing the contrary rests upon the party asserting jurisdiction." Id.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. And, a challenge to the plaintiff's standing, is ultimately a challenge to the Court's subject matter jurisdiction because standing is "an essential and unchanging part of the case-or-controversy requirement of Article III[,]" and the plaintiff bears the burden of establishing it. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). In evaluating

a motion under Rule 12(b)(1), the Court must "assume the truth of all material factual allegations in the complaint" and "construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks and citation omitted).

"[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Coal. for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal citation omitted). If the Court determines at any time that it lacks subject matter jurisdiction, the Court must dismiss the action. Fed. R. Civ. P. 12(h)(3).

**B. Federal Rule of Civil Procedure 56**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Tolan v. Cotton, 572 U.S. 650, 651 (2014) (quoting Anderson, 477 U.S. at 255). The moving party bears the initial burden of showing the absence of a genuine dispute of material fact, and summary judgment is warranted where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When parties submit cross-motions for summary judgment, "the court must review each motion separately on its own merits 'to determine whether either of the parties deserves

judgment as a matter of law'." Fed. Trade Comm'n v. Meta Platforms, Inc., 775 F. Supp. 3d 16, 33 (D.D.C. 2024) (quoting Fam. Tr. of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012)).

## III. ANALYSIS

### A. Whether the Plaintiff Has Established It Has Standing

Because Article III standing is a threshold jurisdictional requirement, the Court must address that issue before considering the merits of the plaintiff's statutory claims. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). Accordingly, the Court first addresses whether the plaintiff has established that it has standing to bring this action on behalf of its members.

An organization may sue on behalf of its members only when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). The first prong of Hunt requires the plaintiff to establish that at least one of its members has suffered an injury in fact that is concrete, particularized, and actual or imminent. See Lujan, 504 U.S. at 560–61; Am. Chemistry Council v. Dep't of Transp., 468 F.3d 810, 815 (D.C. Cir. 2006) (holding that trade associations lacked associational standing because they failed to show that at least one member suffered a concrete and particularized injury sufficient to establish standing). And, although an association need not always publicly identify an injured member by name, it must "identify" or otherwise establish with specific facts, that "at least one identified member ha[s] suffered or would suffer harm." Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009) (holding that environmental organizations lacked associational standing where they relied on the statistical probability that some unidentified

members would be harmed by Forest Service regulations rather than identifying a member with concrete plans to visit an affected site); see also Chamber of Com. of U.S. v. Env't Prot. Agency, 642 F.3d 192, 200–01 (D.C. Cir. 2011) (holding that an association claiming associational standing must identify a member who suffered the requisite injury, and that allegations of injuries to unidentified members are insufficient).

As explained above, the plaintiff brings this suit against the EPA pursuant to the "citizen suits" section of the CAA, 42 U.S.C. § 7604(a)(2), and alleges that the EPA failed to take actions that it was statutorily mandated to take. Specifically, the plaintiff alleges that the EPA failed to waive the 2023 cellulosic biofuel applicable volumes, see Compl. at 14–15, and failed to issue cellulosic biofuel credits for 2023, see id. at 15–16. The plaintiff argues that "[b]ecause [the] EPA failed to . . . partially waive 2023 RFS standards for cellulosic biofuel, [its] members were required to comply with a . . . cellulosic biofuel standard that far exceeded the standard that would have applied if [the] EPA had reduced the [2023] applicable volume of cellulosic biofuel . . . to the projected volume available during [2023]." Pl.'s Mem. at 11. Additionally, the plaintiff alleges that because the 2023 cellulosic biofuel RINs "were priced [ ] between $2.01 to $3.24 per RIN . . . [the plaintiff's] members . . . incur[red] tens of millions of dollars in costs to purchase RINs they should not have been required to purchase." Id. Further, the plaintiff alleges that some of its members have been forced to carry forward RIN obligations into 2024 because of the EPA's alleged failure to act. Id. at 11–12.

The Coalition challenges the plaintiff's position that it has standing. It does not dispute that the interests the plaintiff seeks to protect are germane to its purpose or that the claims asserted requires the participation of individual members, but argues that the plaintiff has failed

to demonstrate that at least one of its members suffered an injury-in fact. See Coalition Mem. at 13–14. The Court agrees with the Coalition.

In order for the plaintiff to sufficiently allege that one of its members has suffered an injury-in-fact from the EPA's alleged failure to act, the plaintiff must show that one of its members was injured because (1) the EPA failed to waive the 2023 cellulosic biofuel volume requirement or (2) the EPA failed to issue cellulosic biofuel credits for 2023. The plaintiff principally relies on the Declaration of Susan W. Grissom, AFPM's Chief Industry Analyst, to establish that its members were in fact injured by EPA's alleged inactions. See generally Grissom Decl. However, the current record before the Court, including Grissom's declaration, does not identify the plaintiff's members or any specific allegation that one of the plaintiff's members actually suffered an injury-in-fact from the EPA's alleged failure to act. Instead, Grissom refers to the plaintiff's alleged members in broad, general, statements. Grissom's declaration begins by merely stating that the plaintiff represents "nearly all refining and petrochemical companies located in the United States" who collectively "own and operate about 88% of U.S. domestic petroleum refining capacity and produce . . . fuel products used by our nation's transportation system" and are therefore obligated parties under the RFS. Grissom Decl. ¶¶ 3 (emphasis added); see id. ¶ 10 ("AFPM members are obligated parties who must comply with the RFS"). However, she does not attest that the plaintiff represents all obligated parties under the RFS. See Summers, 555 U.S. at 498–99 (explaining that the "requirement of naming the affected members has . . . only [been dispensed with] where all the members of the organization are affected by the challenged activity.").

Additionally, Grissom declares that the plaintiff's members "incurr[ed] RIN obligations significantly higher than" they would have incurred had EPA waived the 2023 cellulosic biofuel

requirement to the purported projected volume available in 2023, id. ¶ 27(a); see id. ¶ 29 (declaring that the plaintiff's members were subjected to inflated cellulosic biofuel requirements and therefore needed to acquire additional RINs (or carry forward deficits), but failing to identify any actual member who experienced this alleged harm); see Chamber of Com., 642 F.3d at 199–200 (D.C. Cir. 2011) ("When a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured[, r]ather, the petitioner must specifically 'identify members who have suffered the requisite harm'") (quoting Summers, 555 U.S. at 499). Then, instead of identifying a concrete harm, Grissom speculates that because of the EPA's alleged failure to act, "refiners may be forced to 'carry over' a RIN obligation (deficit) from one year to the next." Grissom Decl. ¶ 27(b). However, the Court is "[w]ithout [any] individual affidavit[]," Summers, 555 U.S. at 499, that this actually occurred, which could have been provided considering that the plaintiff filed its Complaint on August 15, 2024, several months after the 2023 reporting deadline of March 31, 2024, see Renewable Fuel Standard Program: Standards for 2023–2025 and Other Changes, 88 Fed. Reg. at 44479 & n.63 (providing that obligated parties would "have at least nine months from the time of promulgation of [the] final rule . . . to submit associated compliance reports for 2023[,]" which the EPA expected to be March 31, 2024); see Pl.'s Opp'n at 5 (stating that 2023 "compliance was not required until March 31, 2024").[7] Therefore, although the declaration repeatedly refers to "AFPM members," it does not

[7] It follows that since the plaintiff has not demonstrated that any of its members actually suffered a concrete harm from having to carry over RINs to 2024, or were precluded from carrying over RINS to 2024, the plaintiff also fails to demonstrate that any of its members suffered or would suffer injury from having to carry over, or are precluded from carrying over RINs to 2025. See Grissom Decl. ¶ 27(c).

It is also insufficient for the plaintiff to demonstrate that its members suffered a concrete injury by pointing to the EPA's proposed partial waiver of the 2024 cellulosic biofuel volume requirement because, in the proposed rule, the EPA only explains that "[o]ver 20 obligated parties—who together represent 21 percent of the total cellulosic biofuel obligation for 2023—carried a cellulosic RIN deficit into 2024, including two of the six largest obligated parties and seven of the 25 largest obligated parties." Renewable Fuel Standard (RFS) Program: Partial Waiver of

(continued . . .)

identify a specific member or provide member-specific facts from which the Court can determine that at least one member incurred the alleged compliance costs, carried forward a deficit, purchased additional RINs, or otherwise suffered a concrete injury attributable to the EPA's alleged failure to exercise its cellulosic waiver authority.

Moreover, despite the Coalition's standing challenge, the plaintiff has failed to provide any additional declarations or other evidence on the subject, but instead contends in its opposition brief that its standing is "self-evident" because it "represents a large majority of U.S. refiners, who are obligated parties." See Pl.'s Opp'n at 3. But, as the Court noted above, binding applicable precedent has decried that simply alleging that a party represents "the majority" of entities is insufficient to allege an injury-in fact for standing purposes. See Summers, 555 U.S. at 498–99 (rejecting the dissent's approach to "engage in an assessment of statistical probabilities that one of the Sierra Club's members would be adversely affected"); Am. Chemistry Council, 468 F.3d at 819 (finding that standing was not self-evident from the administrative record and explaining that "[i]t is not enough to allege that petitioners' associations comprise the majority of the workers who handle hazardous materials"); Swanson Group Mfg. LLC v. Jewell, 790 F.3d 235, 244 (D.C. Cir. 2015) (declining to find standing where the organization argued that its standing was established because its "members [were] the primary purchasers of timber from O & C Act land").

The plaintiff also argues that, because EPA failed to discharge its alleged non-discretionary duties, its members were "denied compliance flexibility Congress provided in the

---

(. . . continued)
2024 Cellulosic Biofuel Volume Requirement and Extension of 2024 Compliance Deadline, 89 Fed. Reg. 100442-01, 100446 (Dec. 12, 2024). However, this does not list the obligated parties who carried a deficit into 2024 and so the Court cannot solely rely on the administrative record to assure itself that one of the plaintiff's members was one of the 20 obligated parties referred to in the EPA's proposed rule.

[CAA]." Pl.'s Opp'n at 3. The plaintiff further argues that "the failure of [the] EPA to exercise the waiver—that is, the failure of [the] EPA to discharge a duty meant to provide relief to all obligated parties—likewise injures all obligated parties in some way." Pl.'s Opp'n at 3. However, the existence of a potential statutory benefit does not itself establish an injury-in-fact. See Summers, 555 U.S. at 496–97 (holding that a procedural violation, without a concrete injury to an identified member, was insufficient to establish standing). Nor does the Grissom Declaration identify a member that relied on the anticipated availability of such credits, altered its compliance strategy because such credits were unavailable, or otherwise suffered a member-specific injury as a result of the EPA's alleged inaction. See Grissom Decl. ¶¶ 27–31. Accordingly, the plaintiff's asserted loss of compliance flexibility for its members remains too generalized to establish an injury in fact.

The plaintiff also argues that the District of Columbia Circuit's 2025 opinion, which considered, in part, the 2023 cellulosic biofuel volume requirement, did not address the plaintiff's standing before rejecting its arguments. See Pl.'s Opp'n at 3 (citing CBD, 141 F.4th at 183–88). But, the Circuit's silence regarding the plaintiff's standing to join in a direct petition for review from an agency rulemaking does not replace this Court's "independent obligation to assure that standing exists" in its suit brought pursuant to the citizens suit provision of the CAA, "regardless of whether it is challenged by any of the parties." See Summers, 555 U.S. at 499; see also Pl.'s Opp'n at 2 (contending that the "EPA has not challenged [the p]laintiff's standing"). And, the Circuit's decision not to address the plaintiff's standing may well have been because the plaintiff joined the briefing of individual refining companies who were directly regulated by the EPA's rule and so the Circuit did not need to specifically address the plaintiff's standing if at least one of the refinery companies did in fact have standing. See e.g., Final Opening Brief of

American Fuel & Petrochemical Manufactures; REH Company; The Small Refineries Coalition; Countrymark Refining and Logistics, LLC; The San Antonio Refinery LLC; and Wynnewood Refining Co., LLC at i; See Comcast Corp. v. FCC, 579 F.3d 1, 6 (D.C. Cir. 2009) ("[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case") (quoting Ry. Labor Executives' Ass'n v. United States, 987 F.2d 806, 810 (D.C. Cir. 1993)).

Nor does the Circuit's decision in SSM Litigation Group v. Environmental Protection Agency, 150 F.4th 593 (D.C. Cir. 2025), alter the Court's conclusion that the plaintiff has failed to demonstrate an injury-in-fact. See Pl.'s Opp'n at 6–7 (arguing that that the Circuit's decision in SSM Litigation Group supports its argument that it need not submit a declaration from any specific member addressing its standing). The plaintiff argues that, because its members are directly regulated entities, it "need not identify those members to clear the standing bar." Pl.'s Opp'n at 6–7 (citing SSM Litig. Grp. v. Env't Prot. Agency, 150 F.4th at 598). But SSM Litigation Group differs from this case in material ways. There, the District of Columbia Circuit considered a petition for review from SSM Litigation Group, a coalition of trade associations, challenging the EPA's decision to rescind "an affirmative defense to liability for excess emissions caused by emergency events." 150 F.4th at 595.[8] The EPA argued that SSM Litigation Group failed to demonstrate that it had "members that would have standing to sue in their own right." Id. at 597. The Circuit excused the petitioner's failure to include "declarations

[8] When SSM Litigation Group filed its petition, D.C. Circuit Rule 28(a)(7) required a petitioner seeking direct review to "set forth the basis for the claim of standing" in its opening brief and, when standing was "not apparent from the administrative record," to establish standing through "arguments and evidence." SSM Litig. Grp., 150 F.4th at 596–97 (quoting D.C. Cir. R. 28(a)(7)). The D.C. Circuit subsequently amended Rule 28(a)(7), effective August 11, 2025. See U.S. Court of Appeals for the D.C. Circuit, Final Order Adopting Amendments to Circuit Rule 28(a)(7) (July 11, 2025) (effective Aug. 11, 2025). The amended rule now requires that "[i]n cases involving direct review . . . of administrative actions, the brief of the appellant or petitioner must set forth the basis for the claim of standing. . . . The brief must include arguments and cite evidence establishing by a 'substantial probability' the claim of standing." D.C. Cir. R. 28(a)(7).

from any member" in its opening brief because the declarations were included in the reply brief, "the administrative record went a long way toward showing standing[,]" the reply brief declarations did not raise a new theory of standing and made standing "patently obvious[,]" and the EPA "suffered no prejudice from the delay." Id. at 597 (quoting Nat'l Council for Adoption v. Blinken, 4 F.4th 106, 112 (D.C. Cir. 2021)). Here, the plaintiff has opted to not include any additional declarations in the record but instead relies solely on the declaration of Ms. Grissom, who is an employee of the plaintiff, not an employee of any of the members the plaintiff represents. Additionally, unlike SSM Litigation Group, this case does not arise from a petition for direct review, and the standing challenge is not pursuant to a local rule, but rather Article III.

Therefore, because the plaintiff has failed to identify, or otherwise establish through specific facts, that at least one of its members suffered a concrete and particularized injury-in-fact, the plaintiff has failed to satisfy the first prong of Hunt. See Hunt, 432 U.S. at 343. And, because the plaintiff has not established injury in fact, the Court need not address causation or redressability. The Court therefore concludes that the plaintiff has failed to demonstrate that it has associational standing and accordingly must grant the Coalition's cross-motion to dismiss for lack of jurisdiction.

**B. Jurisdiction Pursuant to the Citizen Suits Provision of the CAA**

Although the Court could stop here, it will also consider both the Coalition's and the EPA's arguments that the Court lacks jurisdiction over this case for additional reasons. Separate from its argument regarding the plaintiff's lack of standing, the Coalition contends that this Court also lacks jurisdiction because the plaintiff already challenged the 2023 cellulosic biofuel volume requirements—albeit for different reasons than they raise here—before the District of Columbia Circuit in Center for Biological Diversity v. Environmental Protection Agency,

decided in 2025. See CBD, 141 F.4th at 162; Coalition Mem. at 16–17. Specifically, the Coalition argues that because the "Clean Air Act places jurisdiction [to] challenges [of] any 'nationally applicable regulations promulgated, or final action taken,' by [the] EPA in the U.S. Court of Appeals for the District of Columbia Circuit" pursuant to 42 U.S.C. § 7607(b)(1), the plaintiff "is seeking to take an end-around the limitations on seeking judicial review" by bringing a suit in this Court pursuant to the citizen suits provision of the CAA. Id. at 16 (quoting 42 U.S.C. § 7607(b)(1)).

The EPA contends that this Court lacks jurisdiction over the plaintiff's claims because: (1) the "EPA had no duty to apply the cellulosic waiver authority for the 2023 cellulosic biofuel volumes by a date-certain deadline," thus the EPA has not waived its sovereign immunity pursuant to § 7604(a)(2) of the citizen suits provision of the CAA, see EPA Mem. at 8; and (2) even "if the Court were to find that the Clean Air Act contains a date-certain deadline by which [the] EPA was required to exercise the cellulosic waiver authority, . . . [the p]laintiff could only have challenged that purported failure through its D.C. Circuit petition for review of that rule[,]" id. The Court agrees for the reasons explained below, that the EPA did not have a date-certain deadline by which it was mandated to apply the cellulosic waiver authority for the 2023 cellulosic biofuel volume, and therefore, because that duty was discretionary, the Court lacks jurisdiction pursuant to 42 U.S.C. § 7604(a)(2).

First, as the EPA argues, the plaintiff must show that the EPA had a "clear cut" nondiscretionary duty "to act by a 'date-certain deadline'" in order for the Court to find that the EPA's sovereign immunity is waived for the purpose of reaching the merits of the plaintiff's citizen suit claims. Sierra Club v. Wheeler, 956 F.3d 612, 616 (D.C. Cir. 2020) (quoting Sierra Club v. Thomas, 828 F.2d 783, 791 (D.C. Cir. 1987)). As to Count I of the plaintiff's

Complaint, it contends that the EPA failed to waive 2023 cellulosic biofuel applicable volumes by "November 30 of the preceding calendar year," i.e., November 2022. See Compl. at 14–15 (citing 42 U.S.C. § 7545(o)(7)(D)(i)). But, the EPA "did not promulgate [2023] volume requirements . . . until July 2023." CBD, 141 F.4th at 184. Thus, the EPA "w[as] tardy, and the 2023 requirements, promulgated midway through that compliance year . . . were partially retroactive." Id. After the plaintiff, along with other refinery petitioners, challenged the EPA's tardy promulgation of the 2023 cellulosic biofuel applicable volumes by a direct petition for review in the District of Columbia Circuit, the Circuit clearly held that the plaintiff's challenge failed because the Circuit has "repeatedly [ ] held that [the] EPA may promulgate late, and even retroactive, volume requirements so long as it 'reasonably considers and mitigates any hardship caused to obligated parties by reason of the lateness.'" Id. (quoting Sinclair Wyo. Refin. Co., 101 F.4th at 887). And, in regards to 2023, the Circuit has already held that the EPA did in fact "reasonably consider[] the requisite factors" in setting the volume requirements. CBD, 141 F.4th at 184. Therefore, it follows that if EPA was permitted to issue the 2023 cellulosic biofuel requirements late, i.e., past both October 2021 and November 30 of 2022, then the EPA did not have a "clear cut" nondiscretionary duty "to act by a date-certain deadline." See Sierra Club, 956 F.3d at 616. Accordingly, the Court cannot find that the EPA failed "to perform any act or duty under [the CAA] which is not discretionary with the Administrator." See 42 U.S.C. § 7604(a)(2). Thus, the plaintiff is precluded from pursuing its citizen suit.

Second, the Court is precluded from addressing the merits of Count II of the plaintiff's Complaint for largely the same reasons it cannot address Count I. In Count II, the plaintiff alleges that the EPA failed "to perform a nondiscretionary act or duty to make available for sale cellulosic biofuel credits." Compl. at 15 (capitalization modified). Specifically, "[w]henever the

[EPA] Administrator reduces the minimum cellulosic biofuel volume under [§ 7545(D)], the [EPA] Administrator shall make available for sale cellulosic biofuel credits. . . ." 42 U.S.C. § 7545(o)(7)(D)(ii). But, because the EPA Administrator was not obligated to reduce the 2023 cellulosic biofuel volume requirement—which the D.C. Circuit has already upheld—it also follows that the EPA Administrator was not obligated to issue cellulosic biofuel credits at all, let alone by a date-certain-deadline. See CBD, 141 F.4th at 187–88.

For at least these two additional reasons, the Court must grant the EPA's cross-motion to dismiss because the Court agrees that it lacks subject-matter jurisdiction and the Coalition's cross-motion to dismiss for lack of jurisdiction because the Court agrees that the plaintiff has not adequately demonstrated an injury-in-fact. Having made these findings, the Court need not reach the other reasons that the EPA and the Coalition argue that this Court lacks jurisdiction.[9] Accordingly, the plaintiff's claims must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that: (1) the plaintiff has failed to demonstrate that it has Article III associational standing, and (2) the Court lacks subject-matter jurisdiction of the plaintiff's citizen suit claims pursuant to 42 U.S.C. § 7604(a)(2). Accordingly, the Court grants in part the Coalition's cross- motion to dismiss for lack of subject-matter jurisdiction and grants in part the EPA's cross-motion to dismiss for lack of subject-matter jurisdiction.

[9] The EPA argues that the Court also lacks jurisdiction because the plaintiff can only bring its challenges to the 2023 cellulosic biofuel requirements in a petition for review of an agency action directly to the D.C. Circuit within 60 days of publication of the final rule. See EPA Mem. at 8–9. The Coalition similarly argues that the plaintiff may not bring a citizen suit challenging the EPA's final agency action in this Court but instead may only bring a challenge to the 2023 cellulosic biofuel requirements to the D.C. Circuit pursuant to 42 U.S.C. § 7607(b). See Coalition Mem. at 16–17.

**SO ORDERED** this 16th day of November 2026.[10]

REGGIE B. WALTON
United States District Judge

[10] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.